UNITED STATES of America, Plaintiffs-Appellants,

v.

Oscar S. WYATT, Jr. et al., Defendants-Appellees,

Coastal States Gas Corp., Intervenor-Appellee.

No. 78–2536.

United States Court of Appeals, Fifth Circuit.

Feb. 17, 1981.

Helen M. Eversberg, Asst. U. S. Atty., M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Acting Chief, Charles E. Bookhart, William A. Whitledge, Attys., U. S. Dept. of Justice, Tax Div., Washington, D. C., for plaintiffs-appellants.

C. Leland Hamel, J. Robert Dickerson, Houston, Tex., for Oscar Wyatt.

Fulbright & Jaworski, Charles W. Hall, Kenneth W. Gideon, Lee H. Henkel, III, Houston, Tex., for Coastal States Gas Corp.

Before BROWN, RUBIN and FRANK M. JOHNSON, Jr., Circuit Judges.

JOHN R. BROWN, Circuit Judge:

■ The Internal Revenue Service (IRS) appeals from a May 12, 1978 dismissal of a petition to enforce a summons which normally sought information regarding the income tax liabilities of Coastal States Gas Corporation but which essentially was a part of a government-wide inquiry on corporate slush funds. The District Court dismissed the petition after a show cause hearing on the grounds that the 11 questions which the IRS sought to be answered were overbroad and, therefore, qualifications placed on the answers by Coastal officials were not unreasonable. The Court did not reach the question of relevancy or the defense of attorney client privilege asserted by in-house counsel for Coastal.[1]

We find that the Court's ruling of overbreadth was erroneous as a matter of law. In keeping with the purpose of a show cause hearing, the Court should have ruled on whether or not the questions were relevant to Coastal States' tax liability as required by *United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964).

We are satisfied that the IRS did make a proper showing of relevancy as required under *Powell* and that the summonses should be enforced. For this reason, we reverse and remand with instructions to the District Court to retain jurisdiction until the completion of further IRS administrative proceedings.

### *Auditing the Facts*

The facts on appeal are undisputed and easily summarized. The Internal Revenue Service (IRS) routinely initiated income tax audits of Coastal States Gas Corporation for the fiscal years ending June 30, 1970 through 1972, and for the calendar years 1972 and 1973.[2] In connection with this income tax audit, a series of 11 standardized questions[3] were propounded to the five

1. Nor do we now reach a ruling on Coastal States' assertion of the attorney-client privilege. Rather, we deem it best to defer this matter to the District Court on remand in light of the recent Supreme Court decision of *Upjohn Co. v. U. S.*, — U.S. —, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).

2. The record reflects that Coastal States elected to change its taxable year to coincide to the calendar year.

3. These audits were a part of the IRS's coordinated examination program of large corporations. Under this program, primary responsibility for the audit rests with the initiating officer, a case manager and revenue agents assigned to the audit. The IRS had directed these 11 questions be asked in all coordinated examinations in order to identify and audit corporate slush funds. *See* Internal Revenue Manual 426–348, May 10, 1976. The Manual directs that these *exact* questions be asked:

Coastal States officials who are the appellees. Coastal States' first set of written responses to these 11 questions were rejected by the IRS as being so qualified as to leave the question virtually unanswered. Coastal States then submitted a second set of modified answers which were likewise rejected on the basis of their evasive qualifications. A third set of answers was in progress when Coastal States officials were served with IRS summonses which sought to compel more responsive answers to the 11 questions. Coastal States officials appeared pursuant to the summonses. With the exception of in-house counsel for Coastal States who declined to answer any questions on the grounds of the attorney-client privilege, each official read into the record the identical qualified responses when asked the 11 questions that had been previously

1. During the period from _____ to _____, did the corporation, any corporate officer or employee or any third party acting on behalf of the corporation, make, directly, or indirectly, any bribes, kickbacks or other payments, regardless of form, whether in money, property, or services, to any employee, person, company or organization, or any representative of any person, company or organization, to obtain favorable treatment in securing business or to otherwise obtain special concessions, or to pay for favorable treatment for business secured or for special concessions already obtained?

2. During the period from _____ to _____, did the corporation, any corporate officer or employee or any third party acting on behalf of the corporation, make any bribes, kickbacks, or other payments, regardless of form, whether in money, property or services, directly or indirectly, to or for the benefit of any government official or employee, domestic or foreign, whether on the national level or a lower level such as state, county or local (in the case of a foreign government also including any level inferior to the national level) and including regulatory agencies or governmentally-controlled businesses, corporations, companies or societies, for the purpose of affecting his/her action or the action of the government he/she represents to obtain favorable treatment in securing business or to obtain special concessions, or to pay for business secured or special concessions obtained in the past?

3. During the period from _____ to _____, were corporate funds donated, loaned or made available, directly or indirectly, to or for the use or benefit of, or for the purpose of opposing, any government or subdivision thereof, political party, candidate or committee, either domestic or foreign?

4. During the period from _____ to _____, was corporate property of any kind donated, loaned, or made available, directly or indirectly, to or for the use or benefit of, or for the purpose of opposing, any government or subdivision thereof, political party, candidate or committee, either domestic or foreign?

5. During the period from _____ to _____, was any corporate officer or employee compensated, directly or indirectly, by the corporation, for time spent or expenses incurred in performing services for the benefit of, or for the purpose of opposing, any government or subdivision thereof, political party, candidate or committee, either domestic or foreign?

6. During the period from _____ to _____, did the corporation make any loans, donations or other disbursements directly or indirectly, to corporate officers or employees or others for the purpose of making contributions, directly or indirectly, for the use or benefit of, or for the purpose of opposing, any government or subdivision thereof, political party, candidate or committee, either domestic or foreign?

7. During the period from _____ to _____, did the corporation make any loans, donations or other disbursements, directly or indirectly, to corporate officers or employees or others for the purpose of reimbursing such corporate officers, employees or others for contributions made, directly or indirectly, for the use or benefit of, or for the purpose of opposing, any government or subdivision thereof, political party, candidate or committee, either domestic or foreign?

8. During the period from _____ to _____, did any corporate officer or employee or any third party acting on behalf of the domestic corporation have signatory or other authority or control over disbursements from foreign bank accounts?

9. During the period from _____ to _____, did the corporation maintain a bank account or any other account of any kind, either domestic or foreign, which account was not reflected on the corporate books, records, balance sheets, or financial statements?

10. During the period from _____ to _____, did the corporation or any other person or entity acting on behalf of the corporation maintain a domestic or foreign numbered account or any account in a name other than the name of the corporation?

11. Which other present or former corporate officers, directors, employees, or other persons acting on behalf of the corporation may have knowledge concerning any of the above areas?

Although not pertinent to this appeal, we take note that these 11 questions have since been modified to 5 with the addition of a preamble.

submitted in written form.[4] IRS agents questioned several of the officials on matters relating to the audit, but not a single probing question was specifically put to explore or test the answers given to the 11 questions. For reasons not disclosed the tax examiners failed to avail themselves of this opportunity to press and exclude from the qualifications those categories of events which would be irrelevant or unrelated to a correct determination of Coastal States' tax liability.

In any event, at the subsequent District Court's show cause hearing, the IRS's only witness, the case manager in charge of Coastal States' audit, testified to the relevancy of the 11 questions probing Coastal States' tax liability and to the unacceptabil-

ity of Coastal States' "qualified" answers. After hearing the IRS's case, the Court held that the questions were overbroad and denied enforcement of the summons. The IRS now seeks resolution of two issues whether or not: (i) the Court erred in ruling that the 11 questions were overbroad, and (ii) the attorney-client privilege was properly asserted by Coastal States' in-house counsel.

Actually, the basic question is relevancy. How the judge got diverted from this focal issue to a concern on overbroadness is not too clear. As is so often the case, the responsibility must rest on counsel. The Government's approach was an effort to review the appropriateness of the qualified answers.[5]

---

**4.** Each Coastal States official answered each question 1 through 10 with "no" and the following preamble:

> [T]he Audit Committee of the Board of Directors of Coastal States Gas Corporation is conducting a special investigation into matters which relate to certain of the questions. In connection with an investigation by the Audit Committee, a current report on form 8–K was filed by Coastal States Gas Corporation with the Securities and Exchange Commission in March, 1976. Such report is public information and is available to the Internal Revenue Service.
>
> Accordingly, the responses are not addressed to any of the matters that may have been referred to in such report of any matters which may be included in any subsequent reports filed with the Securities and Exchange Commission.
>
> Therefore, the responses cover only payments which have generated or may in the future generate or affect deductions or credits on the consolidated federal income tax returns of the corporation for the taxable years previously referred to.

In general the officials qualified the answers to cover only payments which generated deductions or credits on the tax return or information not contained in a form "8k" already filed with the SEC. The following is a summary of the qualifications:

1. That their answers related only to transactions within their unrefreshed personal knowledge, and that, in light of the size of Coastal, there were many transactions of which they would have no knowledge,

2. That Coastal's on-going Audit Committee investigation might produce items within the purview of the questions,

3. That in answering the questions negatively, they assumed that the questions were

not intended to reach ordinary business transactions such as payment of taxes, advertising, and business entertainment.

4. That their answers were limited to payments which might generate or affect deductions or credits on Coastal's returns,

5. That the responses did not include expenses of open and customary contact with legislators, government officials, and agencies, travel by public officials in Coastal's aircraft or vehicles, or time allowed to employees for participation in local government, jury duty, poll watching, military service, and the like,

6. That the responses excluded commercially acceptable payments to low level government officials such as foreign customs agents, such payments being reflected on Coastal's books and records, but each Respondent stated that he did not know personally whether any such payments had been made and that it was impossible for him to know given the widespread nature of such practices abroad,

7. That the responses did not include normal business disbursements from foreign bank accounts of Coastal disclosed to the Internal Revenue Service on Form 4683 filed with Coastal's tax returns, and

8. That nominee and brokerage accounts disclosed on Coastal's books and records and maintained in the normal course of business were not included in the responses.

**5.** See, e. g., the following extract from the motion to enforce the summons:

> We expect that the evidence that shall be introduced at the hearing will show that the Internal Revenue Service has a very pertinent need to receive unqualified responses to the eleven questions, that the information is not

The Respondent joined issue, and the Court apparently agreed, that the sole purpose of the hearing was to allow the Government to make a record on its contention that the answers to the eleven questions were not sufficient or adequate.[6]

Neither party addressed relevancy or, for that matter, overbreadth.

## Posting the Positions

The IRS asserts that it demonstrated relevancy at the show cause hearing—the only issue properly before the Court at that time—and that the Court erred in holding at that stage of the proceedings that the summons was overbroad and in allowing the claim of attorney-client privilege. The IRS contends that the questions by their very nature are directed to the types of transactions which may not be reflected at all on the corporate books or may be entered in those books in a disguised manner,[7] and thus, remain hidden from the standard IRS audit procedures. Such transactions are designated by the IRS as slush fund, kickbacks or other illegal payments that could conceivably affect corporate tax liability. In addition, the questions are designed to measure the personal knowledge of specific officers of the corporation, a factor in determining whether or not a civil fraud penalty may be assessed.

Coastal States contends, on the other hand, that it has complied with the summons and should not be expected to give unqualified responses to questions which are not only burdensome and vague but overbroad insofar as they seek information not reflected directly or indirectly on its return. With respect to the assertion of the attorney-client privilege, Coastal States claims in-house counsel should not be required to disclose the very data protected by the privilege simply to demonstrate the validity of his claim.

## Summoning the Light

### A. The Statutory Requirements:

We approach our review of the Court's refusal to enforce the IRS summons in light of the applicable IRS Code sections and judicially developed standards for summons enforcement proceedings. We also examine the Court's decision within the context of the parties' understanding as to the nature of the show cause hearing. The I.R.C. § 7602 authorizes the Secretary of Treasury for "... the purpose of ascertaining the correctness of any return ..., determining the liability of any person for any internal revenue tax ..., or collecting any such liability ... to summons ... any person having possession, custody or care of books of accounts containing entries relating to the business of the person liable for tax

---

already within the possession of the Internal Revenue Service and that the qualifications that have been placed upon the answers render the answers meaningless.
Record, Vol. I, at 198.

**6.** The following colloquy took place between the Court and counsel for Coastal:
[Coastal States' attorney]: Your Honor, I would just like to make it clear for the record that my understanding of the nature of this hearing, to make sure it is correct and that this is a limited hearing, the sole purpose of the Government having a record on its contention that the answers to the eleven questions were not sufficient or adequate. If the Court determines that the answers were adequate, and we request that the Court grant our motion to dismiss on that ground, or otherwise enter an order refusing to enforce the summons. If the Court is unable to render judgment for the Respondents, then I understand that discovery as originally permitted will proceed and a final

hearing on the merits would be set some time subsequent to the discovery.
[The Court]: That is what I understand we are doing.
Record, Vol. II., at 41–42.

**7.** IRS gives the following examples in support of this position.
Payments made to obtain favorable treatment (bribes) could well be entered on the books as entertainment expenses, compensation, part of the cost of goods purchased, or in an operating expense account. Similarly, a payment made to obtain a sale (a kickback) could be reflected as part of the cost of goods sold, as a reduction in the selling price, or as an expense of the sale. Finally, the payments could be made from a "slush fund" created by skimming off an unreported portion of the proceeds from a sale or by salary payments to corporate officials which are then used by those officials to form the slush fund.

..., to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry...." I.R.C. § 7602.[8]

This section, which grants the IRS the authority to investigate "merely on suspicion that the law is being violated or even just because it wants assurance that it is not," *U. S. v. Powell*, 379 U.S. 48, 57, 85 S.Ct. 248, 254, 13 L.Ed.2d 112, 119,[9] has long been characterized as an inquisitorial, rather than an accusatorial power, somewhat analogous to a grand jury investigation. *United States v. Schwartz*, 469 F.2d 977 (5th Cir. 1972); *United States v. Widelski*, 452 F.2d 1 (6th Cir. 1971), *cert. denied*, 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117 (1972); *United States v. Giordano*, 419 F.2d 564 (8th Cir. 1969), *cert. denied*, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970); *United States v. McKay*, 372 F.2d 174 (5th Cir. 1967); *Demasters v. Arend*, 313 F.2d 79 (9th Cir. 1963); *Falsone v. United States*, 205 F.2d 734, 742 (5th Cir. 1953), *cert. denied*, 346 U.S. 846, 74 S.Ct. 103, 98 L.Ed. 375; *Brownson v. United States*, 32 F.2d 844 (8th Cir. 1929). Such inquisitorial powers giving an upper hand to the IRS, have been justified and liberally construed, "because all the facts are in the taxpayer's hands." *Bolich v. Rubel*, 67 F.2d 894, 895 (2nd Cir. 1933).

## B. The Summons Requirements—The IRS Burden:

However, this broad statutory power is not limitless.[10] I.R.C. § 7605(b)

---

**8.** § 7602. Examination of books and witnesses.

For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary is authorized—

(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary may deem proper, to appear before the Secretary at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

(3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry.

**9.** Two Courts in the Southern District of New York have expressed their understanding of the breadth of "official curiosity". *United States v. Acker*, 325 F.Supp. 857 (S.D.N.Y.1971), the Government sought to examine corporate minute books on the grounds that good auditing procedure required their examination. In enforcing the summons, that Court held "the agents of the Internal Revenue Service cannot and need not guarantee that everything they wish to see will be relevant."

*Acker*, 325 F.2d at 872.

Similarly, that same court has observed in *In re International [Corp.] Co.*, 5 F.Supp. 608 (S.D.N.Y.1934);

Obviously, the taxpayer cannot be the judge of what books and papers are relevant and material and thus restrict the examination of his financial affairs to papers of his own selection. A determination of the matter, in the first instance at least, is for the Commissioner, who is charged with the duty of verifying the correctness of the taxpayer's returns. Clearly, all records of financial transactions on the part of the taxpayer are pertinent to an inquiry into the correctness of the taxpayer's return. * * * All books and papers showing the receipts or expenditures by the taxpayer must be examined if there is to be a real and not merely a formal checkup of the correctness of his returns.

*In re International*, 5 F.Supp. at 611.

**10.** Further statutory limitations on the IRS's "inquisitional power" are observed in §§ 7402(b) and 7604 which require summons enforcement solely by the courts through their power of contempt.

§ 7402. Jurisdiction of district courts.

(b) To enforce summons. If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, or other data, the district court of the United States for the district in which such person resides or may be found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, or other data.

§ 7604. Enforcement of summons.

(a) Jurisdiction of district court. If any person is summoned under the internal revenue

forbids any unnecessary investigations or examinations of taxpayers by the IRS.[11] In construing I.R.C. § 7605(b), the Supreme Court in the landmark decision of *United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), established four judicial limitations for the enforcement of a § 7602 summons. *Id.* at 57–58, 85 S.Ct. at 254. It must be pursuant to and relevant to a legitimate purpose, in addition, the information sought must not already be in the IRS's possession and the administrative steps related to IRS investigatory activities and required by the Code must have been followed.[12] *Id.*

■ On this appeal, we are primarily concerned with the relevancy portion of the *Powell* criteria—whether the 11 questions are relevant to Coastal States' tax liability. We declare that the test of relevancy is whether the summons seeks information which "might throw light upon the correctness of the taxpayer's return." *Foster v. United States*, 265 F.2d 183 (2nd Cir. 1959), cert. denied, 360 U.S. 912, 79 S.Ct. 1297, 3 L.Ed.2d 1261 (1960). *Accord, United States v. Davey*, 543 F.2d 996 (2nd Cir. 1976); *United States v. Shlom*, 420 F.2d 263, cert. denied, 397 U.S. 1074, 90 S.Ct. 1521, 25 L.Ed.2d 809 (2nd Cir. 1969); *U. S. v. Matras*, 487 F.2d 1271 (8th Cir. 1973); *United States v. Ryan*, 455 F.2d 728 (9th Cir. 1971). This definition has been narrowed further to require an indication of a "realistic ex-

laws to appear, to testify, or to produce books, papers, records, or other data, the United States district court for the district in which such person resides or is found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, records, or other data.

**(b) Enforcement.** Whenever any person summoned under section 6420(e)(2), 6421(f)(2), 6424(d)(2), 6427(g)(2), or 7602 neglects or refuses to obey such summons, or to produce books, papers, records, or other data, or to give testimony, as required, the Secretary may apply to the judge of the district court or to a United States commissioner [United States magistrate] for the district within which the person so summoned resides or is found for an attachment against him as for a contempt. It shall be the duty of the judge or commissioner [magistrate] to hear the application, and, if satisfactory proof is made, to issue an attachment, directed to some proper officer, for the arrest of such person, and upon his being brought before him to proceed to a hearing of the case; and upon such hearing the judge or the United States commissioner [magistrate] shall have power to make such order as he shall deem proper, not inconsistent with the law for the punishment of contempts, to enforce obedience to the requirements of the summons and to punish such person for his default or disobedience.

This process affords some substantial protection to the taxpayer who then may challenge a § 7602 summons by appearing in court in a show cause hearing. *Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971), stated that the Federal Rules of Civil Procedure (F.R.Civ.P. 81(a)(3)) allow the Court to limit the application of the Federal Rules in enforcement proceedings and, in keeping with that limitation, the show cause order

is an appropriate tool to place the burden of making the affirmative showings required by *Powell* on the party summoned. *Donaldson*, 400 at 528–29, 91 S.Ct. at 541. *Accord, United States v. Harris*, 628 F.2d 875 (5th Cir. 1980). In *United States v. Newman*, 441 F.2d 165 (5th Cir. 1971) this Court has outlined the precise procedure.

> To ascertain whether there is any basis for questioning the summons, the traditional show cause order is an effective and appropriate procedural tool. Indeed, it harmonizes procedure with the substantive principle that puts the burden on the summoned party 'of showing an abuse of the court's process,' *Powell* * * *. In no way does its use extinguish the adversary proceeding which the decisions call for. Rather it is a principal means by which the enforcing court can determine whether there is anything to hear and if so to give proper scope and direction to an orderly, but expeditious, adjudication of the points in controversy.

*Newman*, 441 F.2d at 169.

11. **§ 7605. Time and place of examination.**
   **(b) Restrictions on examination of taxpayer.** No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.

12. *See United States v. McCarthy*, 514 F.2d 368, 372–73 (3rd Cir. 1975) for an outline of appropriate procedural steps to follow in summons enforcement. *See generally, Constraints on the Administrative Summons Power of the Internal Revenue Service*, 63 Iowa L.Rev. 526 (1977).

pectation rather than an idle hope that something might be discovered." *United States v. Harrington*, 388 F.2d 520, 524 (2nd Cir. 1968).

■ In the present case, the IRS elected to establish the *Powell* prong of relevancy by the testimony of the audit case manager. The record clearly establishes that a prima facie showing of relevancy was made. Not only did the agent give examples of the types of transactions to which the questions were directed and how such transactions would affect the taxpayer's income tax liabilities,[13] but detailed the need of the discovery and explanation of reported and unreported transactions.[14]

C. The Taxpayer's Burden:

■ Once this initial *Powell* showing has been made, the burden shifts to the taxpayer to assert objections that the IRS has failed to meet its *Powell* burden, or to assert that enforcement would represent an abuse of the summons process. *Powell*, 379 at 58, 85 S.Ct. at 255, 13 L.Ed.2d at 120. *See United States v. Weingarden*, 473 F.2d 454, 458 (6th Cir. 1973); *United States v. Pritchard*, 438 F.2d 969, 971 (5th Cir. 1971); *United States v. Monsey*, 429 F.2d 1348, 1351 (7th Cir. 1970).[15] Such an abuse would occur if the summons purpose was solely for harassment or to put pressure on the taxpayer to settle a collateral dispute, *Powell*, 379 F.2d at 58, *see, e. g., United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978), *United States v. Roundtree*, 420 F.2d 845 (5th Cir. 1969), *United States v. Pritchard*, 438 F.2d 969 (5th Cir. 1971), or solely for criminal prosecution, *see, e. g., United States v. First National Bank of Atlanta*, 628 F.2d 871, 873–74 (5th Cir. 1980), *United States v. Wright Motor Co., Inc.*, 536 F.2d 1090 (5th Cir.) *rehearing denied*, 542 F.2d 576 (1976), *United States v. White*, 477 F.2d 757, 761 (5th Cir. 1973), *United States v. Dahlstrum*,

493 F.Supp. 966 (C.D.Cal.1980), *United States v. Buck*, 356 F.Supp. 370 (S.D.Tex. 1973), *United States v. Richards*, 431 F.Supp. 249 (E.D.Va.1971), *aff'd*, 631 F.2d 341 (4th Cir. 1980), or where enforcement would contravene the attorney-client privilege, *see, e. g., Reisman v. Caplan*, 375 U.S. 440, at 449, 84 S.Ct. 508, at 513, 11 L.Ed.2d 459 at 466, or the privilege against self-incrimination, *see, e. g., United States at Couch*, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), or for any other purpose other than one of "good faith" on the part of the IRS concerning that particular investigation of civil liability. *Powell* 379 at 58, 85 S.Ct. at 255, 13 L.Ed.2d at 119.

D. The Court's Burden:

■ Despite the ample testimony concerning relevancy which went unchallenged by Coastal States, the Court at the conclusion of the IRS case, erroneously dismissed the summons on the basis of overbreadth rather than ruling on relevancy as contemplated by *Powell*. It is the Court's duty in such a show cause hearing to carefully scrutinize the summons and consider its merits for enforcement. Generally, it must determine whether the summons is overly burdensome or whether it is in good faith, legitimate and relevant to the investigation in progress. *Harrington*, 388 F.2d at 524. While we recognize that a District Court's determination that a summons is overbroad or unclear may generally be within its province, *United States v. Malnik*, 489 F.2d 682, 686 (5th Cir. 1974); *Dunn v. Ross*, 356 F.2d 664, 667 (5th Cir. 1966), such a finding in this case was inappropriate.

■ The Supreme Court, this Circuit, and others as well, recognize that overbreadth and relevance are two separate inquiries. The Supreme Court has stated that if the Fourth Amendment is applicable, it at most guards against the abuse of the summons

13. *See* Appendix I for detailed testimony.

14. *See* Appendix II for detailed testimony.

15. Additional cases representative of recognized grounds for objection to enforcement of § 7602 summonses are gathered in *Comment, The Improper Purpose Challenge to the Section 7602 Summons*, 31 Tax Law 226, 226 n.1 (1977).

powers ". . . only by way of too much indefiniteness or breadth in the things required to be 'particularly described,' [presuming that] the inquiry is one the demanding agency is authorized by law to make and the materials specified are relevant. The gist of the protection is in the requirement, expressed in terms that the disclosure sought shall not be unreasonable." *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, at 208, 66 S.Ct. 494 at 505, 90 L.Ed. 614, at 629. The Supreme Court's delineation of the two terms draws a line between the scope of inquiry and the bearing of the information sought on tax liability. In some Court decisions, the distinctions between these two concepts has perhaps not been followed, as in the case of *United States v. Richards*, 431 F.Supp. 252 (E.D.Va. 1977), aff'd., 631 F.2d 341 (4th Cir. 1980), where the Fourth Circuit stated:

We recognize this relevancy standard to be minimal for a higher threshold might unduly interfere with the Service's ability to detect violations of federal revenue law. However, a summons will be deemed unreasonable and will not be enforced if it is overbroad and disproportionate to the end sought, and a 'fishing expedition' through a taxpayer's records exceeds the relevant scope of the summons power.

*Richards*, 631 F.2d at 345.

Overbreadth has been defined as ". . . out of proportion to the ends sought," *Harrington*, 388 F.2d at 523 *quoting McMann v. SEC*, 87 F.2d 377, 379 (2nd Cir.), *cert. denied, McMann v. Engle*, 301 U.S. 684, 57 S.Ct. 785, 81 L.Ed. 1342 (1937), and ". . . of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power." *United States v. Morton Salt Co.*, 338 U.S. 632, at 652, 70 S.Ct. 357 at 369, 94 L.Ed. 401 at 416; *United States v. Dauphin Trust Co.*, 385 F.2d 129 (3rd Cir. 1967), *cert. denied*, 390 U.S. 921, 88 S.Ct. 854, 19 L.Ed.2d 981 (1960). If such phrases as "relevant scope" are indicative of the Fourth Circuit's approach to these concepts, we would not follow them in the Fifth Circuit where these concepts of overbreadth and relevancy are distinguishable. *See, e. g., United States v. Humble Oil and Refining Co.*, 488 F.2d 953, 959 (5th Cir. 1974), *aff'd. on rehearing*, 518 F.2d 747 (5th Cir. 1975); *Dunn v. Ross*, 356 F.2d 664, 667 (5th Cir. 1966).[16] We find that although *Richards* is the only reported case dealing with the eleven questions, the District Court's reliance on *Richards* does not carry the day.

### Our Audit

■ Based on the foregoing analysis of the terms of relevancy and overbreadth and the record before us, we conclude that (i) the IRS met its *Powell* burden of demonstrating the legitimacy and relevancy of the 11 questions, (ii) the answers were not sufficient and the IRS is entitled to fuller answers and the information sought is not already in the IRS's possession, (iii) the District Court erred in dismissing outright the petition for enforcement of the summonses.

Unfortunately, the case cannot end simply by a reversal and remand. Indeed, as we see it, there is no need for further activity by the District Court at this time

---

16. The Eighth Circuit over an objection of overbreadth enforced a summons calling for all the taxpayer's books and records. That Court held, quoting from *Adams v. F. T. C.*, 296 F.2d 861, 867 (8th Cir.) *cert. denied*, 369 U.S. 864, 82 S.Ct. 1029, 8 L.Ed.2d 83 (1962) that "[b]roadness alone is not sufficient justification to refuse enforcement of a subpoena so long as the material sought is relevant. *Accord, United States v. Giordano*, 419 F.2d 564, 568 (8th Cir. 1970)." An overbreadth summons then is simply a summons which *does not* advise the summoned party what is required of him with sufficient specificity to permit him to respond

adequately to the summons. *Malnik*, 489 F.2d 682 at 686, n.4; *United States v. Tratner*, 511 F.2d 248, 254 (7th Cir.); *Dauphin*, 385 at 131, and where enforcement would constitute an unreasonable search in violation of the Fourth Amendment.

In the Fifth Circuit burdensome is yet another distinct concept. In *Humble, supra*, we recognized that expansiveness of summons is an issue distinct from the *Powell* requirements and stated ". . . information sought by a summons can be relevant and material but yet so burdensome to produce that enforcement should be denied." *Humble*, 488 F.2d at 959–60.

since our holdings and directions are sufficient for the guidance of further steps before the IRS.

■ Several things have to be cleared up. The first and foremost is that the IRS cannot compel taxpayer or taxpayer witnesses to answer any question or questions in a particular way or without qualifications. Nor can the District Court on the application of IRS, direct or compel a witness to answer any question in a particular way or without qualification. It may not do so in a summons proceedings anymore than it could in a trial before the court or jury or both. In either a summons procedure or in a trial in court, this rules out any effort by the investigating agent or the judge to forbid such qualifications as the witness attempts to express. Of course, as in court, the witness is subject to the full, searching, relentless cross-examination concerning all testimony stated and particularly with respect to qualifications or unwillingness or inability to give categorical answers.

Indeed, in the retrospective hindsight which our function affords, it seems clear to us that the intransigent insistence by the interrogating IRS Agents to demand answers without qualifications to the precise questions [17] and a like intransigence upon the part of each witness to try to alter the scope of the questions and to qualify answers has provoked this largely unnecessary controversy.

More than that, at the last personal appearance of the witnesses before the IRS agents when each readopted his earlier written answers each witness was available for and subject to full cross examination. Except for a few superficial questions the agents made no effort by oral examination to explore fully the witness' knowledge or the nature of qualifying factors.

17. See IRS memorandum, September 30, 1976, Defendant's Exhibit No. 44, where the Chief of the Audit Division of the Austin District of the IRS instructed agents under his jurisdiction: 1. That we follow Manual Supplemental A2g–348 (11 questions) in its entirety. 2. That we not modify the questions in any manner, nor should

We emphasize that the District Court has ample powers to deal with questions which are so broad as to be incapable of answer by the witness or seeking information beyond the proper scope of the government's interest in the inquiry. Likewise, it has ample powers to handle answers which are so qualified as to amount to nothing more than evasion. The District Court, as do we, may expect the utmost good faith on the part of the IRS in the formulation of their questions and a like good faith on the part of the witnesses in answering those questions. It is not too much for us to hope that with the directions we give and the revision by the IRS reducing the eleven questions to five with a preamble which clothes the auditing agents with considerable discretion, that much of the previous travail, contention, controversy, and dispute, happily will be avoided.

The result is that we reverse and remand to the District Court. We suggest it to continue to hold the case pending further proceedings before the IRS investigating agents and the issuance of such orders consistent with this opinion as might be required or appropriate.

REVERSED and REMANDED.

APPENDIX I

The following is an exchange between IRS Counsel, Locke, and Case Manager Meyers:

THE COURT: IT IS ADMITTED.

Q (BY MR. LOCKE) LOOKING AT GOVERNMENT EXHIBIT TEN, MR. MYERS, QUESTION ONE, WITHOUT READING THE QUESTION AS STATED THERE, COULD YOU TELL ME HOW THAT QUESTION WOULD BE RELEVANT TO THE TAX LIABILITY OF THE CORPORATION LIKE COASTAL STATES?

we allow the taxpayers to modify the questions or to qualify the responses. 3. That we make every effort to question the officers face to face, rather than accepting written responses.

From what we have said, the last clause of item 2 has no validity.

A. YES. IN THIS QUESTION, PAYMENTS, BRIBES OR KICKBACKS THAT WERE MADE IN VIOLATION OF FEDERAL OR STATE LAWS WOULD NOT BE DEDUCTIBLE FOR INCOME TAX PURPOSES.

AN EXAMPLE WOULD BE IF THE CORPORATION HAD MADE KICKBACKS TO A SUPPLIER OF REGULATED NATURAL GAS. THIS COULD CONSTITUTE A VIOLATION OF FTC RULES, THUS THE DEDUCTION WOULD NOT BE ALLOWED FOR FEDERAL INCOME TAX PURPOSES.

Q GOING TO QUESTION TWO, COULD YOU EXPLAIN TO ME AND TO THE COURT HOW THAT QUESTION IS RELEVANT TO THE FEDERAL TAX LIABILITY?

A QUESTION TWO CENTERS AROUND THE SAME KIND OF PAYMENTS TO EMPLOYEES OF THE GOVERNMENT, AND IN THIS CASE ANY PAYMENTS MADE TO AN EMPLOYEE OF A FEDERAL GOVERNMENT, LET'S SAY TO FACILITATE THE MOVEMENT OF GOODS, WOULD BE IN VIOLATION OF FEDERAL LAW, AND WOULD BE NOT AN ALLOWABLE DEDUCTION FOR INCOME TAX PURPOSES.

Q THE PAYMENTS SUCH AS THE ONES YOU DESCRIBED WERE MADE AND DEDUCTIONS WERE TAKEN, THEN THAT DEDUCTION COULD BE DISALLOWED BY THE INTERNAL REVENUE SERVICE?

A YES. THAT EXAMPLE I GAVE YOU IS JUST ONE. ANY KIND OF A PAYMENT MADE TO AN OFFICIAL OF A GOVERNMENT WOULD NOT BE AN ALLOWABLE DEDUCTION, PROBABLY, AND THIS QUESTION SEEKS TO DETERMINE IF ANY OF THESE PAYMENTS WERE MADE.

Q NOW, WITH RESPECT TO QUESTION THREE, COULD YOU TELL ME THE RELEVANCE OF THAT QUESTION TO FEDERAL INCOME TAX LIABILITY OF A CORPORATION SUCH AS COASTAL STATES?

A OKAY. QUESTION THREE DEALS WITH CORPORATIONS DONATING FUNDS, ET CETERA, TO POLITICAL CANDIDATES OR PARTIES, ET CETERA. A CORPORATE PAYMENT TO A POLITICAL CANDIDATE IS GENERALLY NOT AN ALLOWABLE DEDUCTION, SO IF WE WERE TO DETERMINE IF ONE HAD BEEN MADE, IT WOULD BE NOT AN ALLOWABLE DEDUCTION FOR INCOME TAX PURPOSES.

Q CAN YOU DO THE SAME THING WITH QUESTION FOUR?

A NUMBER FOUR IS ALONG THE SAME AREA. IT REFERS BASICALLY TO THE DONATION OF CORPORATE PROPERTY OR THE USE OF CORPORATE PROPERTY, AND THE SAME WOULD HOLD TRUE FOR NUMBER FOUR AS IN NUMBER THREE. IT WOULD STILL BE CONSIDERED A CONTRIBUTION AS SUCH TO A POLITICAL PARTY AND IT WOULD NOT BE A DEDUCTION FOR INCOME TAX PURPOSES.

Q COULD YOU GIVE ME AN EXAMPLE OF PROPERTY THAT COULD BE—

A YES. IF A CORPORATION WAS TO DONATE A BUILDING OR WAS TO DONATE THE USE OF A BUILDING TO A POLITICAL CANDIDATE FOR A PARTY, THIS IS THE TYPE OF SITUATION THAT WOULD BE COVERED IN THIS QUESTION.

Q WOULD THE USE OF A CORPORATE AIRPLANE BE THE SAME KIND OF THING?

A YES, ANY CORPORATE PROPERTY.

Q I TAKE IT, THEN, THAT THE FAIR RENTAL VALUE OF THAT BUILDING OR AIRPLANE WOULD NOT BE A PROPER BUSINESS EXPENSE?

A WE WOULD HAVE TO LOOK INTO THE PARTICULAR EVENT TO DETERMINE THE AMOUNTS, BUT IT WOULD BE CONSIDERED A PAYMENT IN KIND.

Q HOW WAS QUESTION FIVE RELEVANT TO THE TAX LIABILITY OF COASTAL STATES GAS?

A QUESTION FIVE CONCERNS A CORPORATION PAYING A SALARY OR PAYING AN INDIVIDUAL WHO DOES WORK FOR A POLITICAL PARTY OR A POLITICAL CANDIDATE, ET CETERA. THE SALARY OF A CORPORATE EMPLOYEE LOANED TO A POLITICAL CANDIDATE OR A POLITICAL PARTY IS NOT GENERALLY ALLOWABLE DEDUCTION FOR FEDERAL INCOME TAX PURPOSES. IF WE WERE TO DETERMINE THAT ANY CORPORATION HAD LOANED ITS EMPLOYEES TO A CANDIDATE, WE WOULD HAVE A SERIOUS QUESTION AS TO WHETHER OR NOT IT WAS AN ALLOWABLE DEDUCTION.

Q QUESTION SIX?

A QUESTION SIX DEALS WITH CORPORATIONS MAKING ANY LOANS, DONATIONS OR OTHER DISPERSEMENTS DIRECTLY OR INDIRECTLY TO OFFICERS OR EMPLOYEES FOR THE PURPOSE OF PASSING IT ON TO INDIVIDUALS, POLITICAL CANDIDATES OR WHAT HAVE YOU, POLITICAL PARTIES.

A BONUS TO A CORPORATE OFFICER THAT WAS GIVEN WITH THE UNDERSTANDING THAT IT WOULD BE PASSED ON TO A POLITICAL PARTY OR CANDIDATE IS GENERALLY NOT AN ALLOWABLE DEDUCTION. SO IT CANNOT BE USED AS A DEDUCTION FOR FEDERAL INCOME TAX PURPOSES.

Q SO QUESTION SIX IS REALLY QUESTION FIVE ONLY DONE INDIRECTLY, LOOKING AT THE TRANSACTION AS IF THE CORPORATION WAS ATTEMPTING TO DO IT INDIRECTLY?

A YES.

Q NOW, QUESTION SEVEN, HOW IS THAT RELEVANT?

A QUESTION SEVEN DEALS WITH THE CORPORATION MAKING LOANS, DONATIONS, OR OTHER DISPERSEMENTS DIRECTLY OR INDIRECTLY. AN EXAMPLE, FOR THE BENEFIT OF POLITICAL PARTIES, CANDIDATES, ET CETERA, IF AN INDIVIDUAL ON HIS OWN HAD MADE A DONATION TO A POLITICAL PARTY AND LATER ON HE WAS REIMBURSED BY THE CORPORATION FOR THAT, FOR THAT EXPENSE THAT HE INCURRED, THE CORPORATION WOULD NOT BE ALLOWED TO DEDUCT THAT AS FAR AS FEDERAL INCOME TAXES.

Q SO THAT IS AGAIN ANOTHER INDIRECT METHOD OF WHAT NUMBER FIVE WAS DEALING WITH?

A THAT'S RIGHT.

Q QUESTION EIGHT?

A QUESTION EIGHT GETS INTO ANOTHER AREA AS FAR AS FOREIGN BANK ACCOUNTS. DID ANY CORPORATE OFFICER OR EMPLOYEE OR THIRD PARTY ACTING IN BEHALF OF THE CORPORATION HAVE SIGNATURE OR OTHER AUTHORITY OVER OR CONTROL OVER DISPERSEMENTS FOR FOREIGN BANK ACCOUNTS.

QUESTION EIGHT, WE ARE SEEKING TO FIND OUT IF FOREIGN BANK ACCOUNTS THAT WERE CONTROLLED BY THE CORPORATE EMPLOYEES DID EXIST, AND IF SO WE

WOULD LIKE TO, OF COURSE REVIEW THESE BECAUSE THERE IS A GOOD POSSIBILITY THAT UNREPORTED INCOME COULD BE CHANNELLED INTO A FOREIGN BANK ACCOUNT AND WE WOULD NEED TO KNOW ABOUT THAT ACCOUNT TO KNOW IF IT EXISTS.

THE UNREPORTED INCOME, IF DISCOVERED, WOULD BE INCLUDED AND WOULD INCREASE THE TAXABLE INCOME OF THE CORPORATION.

Q NOW, QUESTION NINE?

A QUESTION EIGHT ASKED ABOUT AUTHORITY OVERSEAS. QUESTION NINE ASKED IF THE CORPORATION ACTUALLY MAINTAINED THE ACCOUNT, AND THE SAME REASONS WOULD BE FOR QUESTION NINE IN THE DETECTION OF FOREIGN BANK ACCOUNTS COULD LEAD TO DETECTION OF A SLUSH FUND OR COULD LEAD TO UNREPORTED INCOME BEING CHANNELLED TO THE FOREIGN BANK ACCOUNT.

Q QUESTION TEN, DOES THAT DEAL WITH THE SAME AREA ALSO?

A YES. IT GETS INTO THE AREAS OF DOMESTIC OR FOREIGN, DOMESTIC OR FOREIGN NUMBERED ACCOUNTS OR IN THE NAME OF SOMEONE OTHER THAN THAT OF THE CORPORATION. IN THIS INSTANCE, WHETHER IT BE FOREIGN OR DOMESTIC, IT IS POSSIBLE THAT AN UNREPORTED INCOME COULD BE DEPOSITED IN A NUMBERED ACCOUNT OR IN THE NAME OF ANY OTHER BUSINESS OR PERSON, AND WE NEED TO KNOW THE INFORMATION ABOUT THESE ACCOUNTS SO WE COULD DETERMINE IF THERE WAS UNREPORTED INCOME OR IF IT WERE USED FOR SLUSH FUND PURPOSES OR WHATEVER.

Q SO QUESTIONS EIGHT, NINE, TEN ARE DEALING WITH FOREIGN BANK ACCOUNTS, AND YOU WANT TO KNOW ABOUT THEM SO YOU CAN TAKE A LOOK AND SEE IF THERE WAS ANYTHING UNUSUAL?

A THAT'S CORRECT, AND EACH ONE GOES INTO A DIFFERENT AREA, BUT OVERALL IT IS TO DETERMINE IF THEY ARE IN EXISTENCE.

Q WHY FOREIGN ACCOUNTS, WHY IS THAT A DISTINCTION BETWEEN FOREIGN ACCOUNTS AND DOMESTIC ACCOUNTS, DO YOU HAVE ANY IDEA WHY THE QUESTIONS DON'T DEAL WITH DOMESTIC ACCOUNTS?

A WELL, QUESTION TEN DOES, DOMESTIC OR FOREIGN. A FOREIGN ACCOUNT, OF COURSE, IS SOMEWHAT EASIER TO CONCEAL THAN A DOMESTIC ACCOUNT, IN THAT IN MANY INSTANCES THE RECORDS ARE NOT AVAILABLE TO THE SERVICE IN FOREIGN COUNTRIES.

Q NOW, QUESTION ELEVEN. HOW IS THAT QUESTION RELEVANT TO YOUR INVESTIGATION?

A THIS QUESTION BASICALLY ASKS THAT THE EMPLOYEE THAT WE ARE INTERVIEWING PROVIDE US WITH THE NAME OF ANY FORMER OR PRESENT EMPLOYEE OR CORPORATE OFFICER WHO WOULD HAVE KNOWLEDGE OF ANY OF THE ITEMS IN THE PREVIOUS QUESTIONS. THEY WOULD BE IMPORTANT TO US, BECAUSE THERE ARE CIRCUMSTANCES WHERE AN OFFICER MAY NOT KNOW THE FACTS OF ANY GIVEN TRANSACTION, BUT HE WOULD BE FAMILIAR WITH SOMEONE WHO DID HAVE THE FACTS. HERE WE ARE SIMPLY ASKING THE OFFICERS THAT

WE QUESTIONED, DO YOU KNOW OF ANYONE, ANY OFFICER, FORMER EMPLOYEE OR PRESENT EMPLOYEE WHO WOULD HAVE KNOWLEDGE AS FAR AS THESE ITEMS ARE CONCERNED, AND IF SO, WILL YOU GIVE US HIS NAME AND MAYBE WE CAN TALK TO HIM.

THE INDIVIDUAL THAT THESE PEOPLE KNOW THAT COULD HAVE HAD SOME OF THIS KNOWLEDGE MAY BE ABLE TO GET US SOME INFORMATION THAT WOULD BE RELEVANT TO THE TAX LIABILITY OF COASTAL STATES.

Record, Vol II, at 14–22.

### APPENDIX II

The following colloquy took place between the Court and counsel for Coastal:

Q  NOW, YOU HAVE BEEN CONDUCTING—____FIRST OF ALL, WHY DO YOU NEED THESE ELEVEN QUESTIONS, WHY CAN'T YOU JUST USE NORMAL AUDIT TECHNIQUES, EXAMINATION OF DOCUMENTS AND RECORDS IN THE VARIOUS CORPORATIONS LOCATED IN THIS COUNTRY?

A  IN MANY INSTANCES THE BOOKS AND RECORDS COULD NOT REFLECT THE INTENT OR THE VARIOUS AREAS, THE VARIOUS ITEMS THAT WENT INTO ANY GIVEN TRANSACTION. OF COURSE, ITEMS THAT ARE NOT REPORTED ON THE BOOKS AND RECORDS ARE NOT AVAILABLE IN THE BOOKS AND RECORDS. SO WE DON'T HAVE THOSE TO LOOK AT.

THE OFFICERS THAT WE SELECTED TO TALK TO, TO INTERVIEW, ARE PEOPLE THAT WE FELT LIKE, BECAUSE OF THEIR KNOWLEDGE OF THE CORPORATION, WOULD BE IN A POSITION TO KNOW PAYMENTS AND ITEMS ALONG THE AREAS OF THE ELEVEN QUESTIONS SET OUT. THEIR PERSONAL KNOWLEDGE COULD BE A LOT GREATER THAN WHAT IS REFLECTED IN THE BOOKS AND RECORDS AS FAR AS THE PURPOSE OF ANY GIVEN TRANSACTION.

ANOTHER THING, COASTAL STATES IS A VERY BIG CORPORATION, AND ALL OF THE EXAMINATIONS, THERE ARE HUNDREDS OF THOUSANDS OF TRANSACTIONS, IT IS NOT HUMANLY POSSIBLE TO LOOK AT ALL OF THESE TRANSACTIONS. WE LOOK AT AREAS THAT WE FEEL ARE IMPORTANT. BUT WE CANNOT LOOK AT EVERYTHING. WE NEED TO BE IN POSITION TO ASK QUESTIONS OF PEOPLE WHO HAVE THE KNOWLEDGE OR ARE IN THE DECISION MAKING ASPECTS OF THE CORPORATION IN ORDER TO FIND OUT WHAT IS REALLY TRANSPIRING.

A LOT OF TIMES IT IS COMMON THAT TRANSACTIONS WILL BE MISCLASSIFIED. WE MAY LOOK FOR SOMETHING IN ONE AREA AND IT MAY END UP IN SOME OTHER AREA. WE WILL GENERALLY LOOK AT AREAS WHERE ITEMS ARE USUALLY PLACED IN BOOKS AND RECORDS, BUT DUE TO MISCLASSIFICATIONS OR OTHER REASONS, SOMETIMES ITEMS ARE NOT WHERE THEY HISTORICALLY SHOULD BE IN THE BOOKS AND RECORDS, SO THE INTERVENING OF THE CORPORATE OFFICERS ABOUT THEIR PERSONAL KNOWLEDGE REALLY GIVES US A LITTLE INSIGHT AS TO THE TRANSACTIONS THAT HAVE OCCURRED.

Q  NOW, THESE QUESTIONS ARE SOMEWHAT BROADER THAN THE EXAMPLES THAT YOU USED TO SHOW THEIR RELEVANCE, IN THAT THEY APPEAR TO ASK FOR ALL PAYMENTS, THEY DON'T JUST ASK FOR LEGAL PAYMENTS. WHY ARE THEY BROADER THAN WHAT YOU ARE TALKING ABOUT, AND

WHAT YOU USED AS EXAMPLES?

A IT IS VERY IMPORTANT THAT WE ARE ABLE TO UNDERSTAND AND KNOW ALL OF THE TRANSACTIONS, AND THEN DECIDE THE CONSEQUENCES OF THE TRANSACTION. THE TAXPAYER OR CORPORATION MAY FEEL THAT AN ITEM IS CLASSIFIED CORRECTLY, AND IT IS NOT AN ILLEGAL PAYMENT. BUT WE HAVE TO LOOK AT THE TRANSACTIONS AND LOOK AT THE FACTS SURROUNDING THE TRANSACTION, AND MAKE THAT DECISION FOR OURSELVES.

AND IF THEY DETERMINE WHAT IS LEGAL OR ILLEGAL AND JUST GIVE US WHAT THEY THINK IS ILLEGAL, WE WILL NOT GET A CHANCE TO LOOK AT ALL THE OTHER TRANSACTIONS.

Q SO ESSENTIALLY YOU ARE SAYING YOU WOULD EXAMINE TRANSACTIONS AND NOT JUST ALLOWABLE DEDUCTIBLE ITEMS?

A WE EXAMINE TRANSACTIONS, BUT WE REALLY TRY TO DO IS DETERMINE THE TAX LIABILITY OF THE TAXPAYER, AND IN ORDER TO DO THAT, WE HAVE TO REVIEW THE VARIOUS TRANSACTIONS, NOT JUST THE TRANSACTIONS THAT ARE IN THE BOOKS AND RECORDS, NOT JUST THE TRANSACTIONS THAT ARE SET UP IN THE TAX RETURN. WE HAVE TO GO BEYOND THAT IN ORDER TO DETERMINE THE TAX LIABILITY. THERE IS A LOT OF DIFFERENCE IN THAT.

Record, Vol. II, at 22–25.