UNITED STATES of America and Revenue Agents Clarence H. Isabel and John S. Reid of the Internal Revenue Service, Petitioners-Appellees,

v.

The EL PASO COMPANY, Respondent-Appellant.

No. 81-2484.

United States Court of Appeals, Fifth Circuit.

Aug. 13, 1982.

Rehearing and Rehearing En Banc Denied Sept. 15, 1982.

Walter P. Zivley, D. Mitchell McFarland, Jack L. Underwood, Lee K. Boocker, Houston, Tex., for respondent-appellant.

Michael L. Paup, William A. Whitledge, Attys., Tax Div., U. S. Dept. of Justice, Washington, D. C., for petitioners-appellees.

Before GOLDBERG, WILLIAMS and GARWOOD, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

The United States and two agents of the Internal Revenue Service (IRS) petitioned the district court to enforce two summonses issued to the El Paso Company (El Paso) with regard to a tax audit. One summons sought El Paso's "tax-pool analysis"—a summary of El Paso's contingent liability for additional taxes should it ultimately be determined that El Paso owed more taxes than indicated on its return. After a hearing, the district court enforced the tax pool analysis summons and El Paso brought this appeal. We affirm.

## I.

El Paso is the holding company for several large corporations, including 67 subsidiaries. The principal operations in the El Paso conglomerate are the El Paso Natural Gas Company, the El Paso Products Company, and the El Paso LNG Company. All are based in Texas. Because of the size and variety of El Paso's business, the calculation of El Paso's tax liability is an immense task. To prepare a return for a single year, El Paso's in-house staff expends over 10,000 hours.

The IRS, as it does with most giant corporations, annually audits El Paso and has been doing so since the 1940s. To perform the audit, the IRS assembles a team of revenue agents. Even with a team specifically assigned to El Paso, however, the IRS has time to review and inspect only a small sample of the documents that underlie El Paso's returns. The audit of El Paso that triggered the summons in this case was not conducted on suspicion of fraud; rather, it was a routine audit occasioned by the amount of taxes at stake.

Each audit of El Paso covers several years of tax returns. The relevant cycle in this case includes the years 1976, 1977, and 1978. Early in the audit of the 1976–1978 cycle, the IRS team coordinator delivered a document request to El Paso for "all analyses prepared by the El Paso Company regarding potential tax liabilities and tax problems" for the years covered by the cycle. Five days later, Jack McCarthy, the head of El Paso's tax department, returned the request form marked "refused".[1]

 Shortly after receiving El Paso's refusal to respond to the potential tax-liabilities document request, the IRS issued a summons to McCarthy covering "any document, memorandum, letter, or work papers which identify potential tax liabilities or tax problems for the period beginning January 1, 1976 and ending December 31, 1978, inclusive." McCarthy also declined to comply with the summons, stating his reasons in a letter written to the case manager of the El Paso audit.

On May 27, 1981, the IRS filed its petition to enforce the summons under 26 U.S.C. § 7604.[2] El Paso defended against enforcement on grounds of burdensomeness, relevance, attorney-client privilege, and work product doctrine. After a hearing at which both sides were permitted to call and cross-examine witnesses, the district court rejected El Paso's defenses and concluded that El Paso must comply with the summons.

El Paso appealed and sought a stay of the district court's judgment from this Court. Because of the importance and the novelty of the issues raised with respect to the IRS's summons powers, we granted the stay pending our resolution of the case.

## II.

This appeal is centrally concerned with documents known to the accounting profession under various names—the noncurrent tax account, the tax accrual work papers, and the tax pool analysis. Because the nomenclature is not standardized, the IRS chose to request El Paso's version of these documents under a loose descriptive label—documents analyzing potential tax liabilities or tax problems. No matter what alias is used, however, the documents are of similar nature. It is useful to explain what these documents are before proceeding to determine whether the IRS may have access to them.

---

**1.** The IRS had simultaneously submitted a request for a list of all internal-audit reports prepared by El Paso for the years covered by the cycle. McCarthy also refused this request. The IRS subsequently made the internal-audit request the subject of a summons. The district court enforced this summons and El Paso does not appeal from this aspect of the judgment.

**2.** Section 7604(a) provides:

> If any person is summoned under the Internal Revenue laws to appear, testify, or to produce books, papers, records, or other data, the United States District Court for the district in which such person resides or is found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, records, or other data.

The income tax laws, as every citizen knows, are far from a model of clarity. Written to accommodate a multitude of competing policies and differing situations, the Internal Revenue Code is a sprawling tapestry of almost infinite complexity. Its details and intricate provisions have fostered a wealth of interpretations. To thread one's way through this maze, the business or wealthy taxpayer needs the mind of a Talmudist and the patience of Job.

Even endowed with these qualities, however, no taxpayer completes a return with the certainty that the IRS will agree with the bottom line, or the many steps taken to get there. There is no tax oracle one may consult to learn how a return will fare under the scrutiny of the revenue agents and the courts. The Code, after all, is a finite system of rules designed to apply flexibility to an infinite variety of situations. There are many "gray areas" in the tax world, twilight zones in which one may only dimly perceive how properly to treat a given accretion to wealth or given expenditure of funds.

When a large corporation like El Paso completes its return, the number of decisions in the gray areas is enormous. To characterize a sale as ordinary income or capital gain, to depreciate equipment over ten years or twenty, to attribute a transaction to this year or to the next: these decisions recur over and over in a course of preparing a return and guarantee that a large corporation has many opportunities to choose in good faith an interpretation of the tax code that leans toward lessening its taxes. The return is filed with the understanding, however, that the IRS may challenge some of these questionable positions and, through settlement or litigation, the corporation may end up owing more taxes than it initially acknowledged.

Business reality compels corporations to recognize on their financial sheets that the return as filed is not the last word in determining the taxes owed. Public companies subject to the securities laws must file financial statements with the Securities and Exchange Commission (SEC), 15 U.S.C. § 78*l*. SEC regulations require that independent accountants verify these financial statements in accord with Generally Accepted Auditing Principles, 17 C.F.R. § 210.1–02(d). To demonstrate to the accountant that a balance sheet does not portray an overly-rosy view of a corporation's financial health, the balance sheet must provide for contingent future tax liabilities. In short, the corporation must set aside an account to cover additional taxes that it may become liable to pay above and beyond the amount indicated on the initial return.

To comply with the securities laws, therefore, companies such as El Paso *must* prepare in-house or have prepared by outside auditors an analysis of their contingent tax liabilities.[3] The analysis pinpoints the soft spots on the corporation's tax returns and indicates those areas in which the taxpayer has taken a position that may, upon challenge, negotiation, or litigation, require the payment of more taxes. The analysis is known in the trade as the tax pool analysis, the noncurrent tax account, or tax accrual work papers.

Several points are worth noting about the tax pool analysis. First, it is not prepared to assist in filling out a tax return. The tax pool analysis is undertaken only after the return is filed. Although the same corporate employees or outside auditors may prepare both the return and the tax pool analysis, there is *no necessary connec*tion between the two jobs.

Second, the tax pool analysis may be performed either in house or by outside accountants. El Paso happens to prepare its own tax pool analysis, but many firms retain outside accountants to accomplish that task. *See United States v. Arthur Young & Co.*, 677 F.2d 211 (2d Cir. 1982). It is not

---

**3.** El Paso also informs us that the New York Stock Exchange requires that a corporation whose stock is traded on the Exchange have its books audited in accord with Generally Accepted Auditing Principles. Moreover, banks that lend to public companies may also demand that a corporation maintain an account for contingent tax liabilities.

essential to consult an attorney to prepare the tax pool analysis.

Finally, the tax pool analysis is "[p]repared for financial reporting purposes alone...." Caplin, *IRS Toughens Its Stance on Summoning Accountant's Tax Accrual Workpapers*, J. Tax 130 (Sept. 1980). While the analysis must forecast the cumulative results of IRS audit, settlement, and litigation, the tax pool analysis itself is not prepared to respond to a specific charge by the IRS or to any pending or impending lawsuit. The tax pool analysis is undertaken solely to insure that the corporation sets aside on its balance sheet a sufficient amount to cover contingent tax liability.

### III.

Before we turn to the objections raised by El Paso to the enforcement of the "potential tax liabilities" summons, we must determine the scope of the judgment below. El Paso contends that the judgment requires production of much more than the tax pool analysis and backup memoranda and files. In El Paso's view, the district court's judgment encompasses all El Paso documents that treat "tax problems." This category, El Paso tells us, is so broad as to comprise all files in El Paso's tax department.

El Paso also protests that it relied on IRS representations at trial that the government sought only the tax pool analysis and backup files, and defended the case on that basis. To expand the judgment beyond the tax pool analysis and backup files, El Paso concludes, is unjust.

Finally, El Paso contends that there are no "backup files" to the tax pool analysis. The tax pool analysis consists of four to five accounting pages each year listing items the tax treatment of which might be vulnerable to challenge. A dollar amount is indicated for each item. El Paso denies that specific backup files exist.

We first review the genesis of the judgment's language. The subject matter of the original IRS summons was documents concerning "potential tax liabilities and tax problems." According to the IRS, it chose this language because it did not know what name El Paso bestowed on its tax-accrual workpapers file. The district court issued an order to El Paso to show cause why the summons should not be enforced. In answer, El Paso revealed its terminology, at least in part. An affidavit filed by El Paso referred to the "vast majority" of the documents sought by the summons at issue as "documents containing or comprising the 'tax pool analysis' or discussing items reflected in the company's financial statements as income or expense where the ultimate tax treatment was or is unclear." While written in the disjunctive, this reference actually points to but a single set of documents. The more expansive language in the latter portion of the statement is drawn from the IRS's own guidelines that define the term tax pool analysis.[4]

At the summons enforcement hearing, El Paso complained that it was unable to defend against enforcement because the summons lacked sufficient clarity to apprise it of the documents sought. The IRS responded that the El Paso affidavit, quoted above, adequately described what the government wanted. Since El Paso itself had used the term tax pool analysis, the IRS argued, El Paso could not deny that it knew what the IRS was after. The IRS conceded, however, that if the court found that the summons was too broad as written, the court could narrow it to the documents described in the El Paso affidavit.

The district court was understandably perplexed by the inability of the parties to agree on the subject matter of the summons. To give the IRS a chance to clarify what it sought, the court briefly recessed. In the recess, El Paso told the IRS that its

---

4. On June 12, 1980, the IRS adopted for the first time guidelines for the summoning of tax accrual workpapers. *Caplin, supra*; Internal Revenue Manual § 4024.3, *revised*, May 14, 1981. The manual defines tax pool analysis in part as "a memorandum discussing items reflected in the financial statements as income or expense where the ultimate tax treatment is unclear." This definition has been retained in the May 14, 1981 revision.

reserve for contingent tax liability was called "the non-current tax account." The size of the non-current tax account was determined through the tax pool analysis.

The IRS then reduced to writing a description of the documents it sought:

1. Non-current tax account plus backup.
2. Documents identifying tax problems or potential tax problems created in or referred to the Tax Department or its superiors.

The judgment enforcing the summons substantially tracks this language.

We must interpret the judgment in the context in which its specific language was chosen. The IRS and El Paso wrangled over the scope of the summons. To give shape to its request, the IRS sought to borrow language from an El Paso affidavit. When this language also produced confusion, the IRS turned to yet other clarifying terms. This linguistic pas de deux yielded the language that the judgment now embodies.

The first sentence of the clarification of the summons, we believe, is tolerably clear. The "noncurrent tax account" refers to the four to five page list of the items believed to be vulnerable to challenge. This list is also known as the tax pool analysis. "Backup" refers to the memoranda on which the assessment of vulnerability is based. Despite El Paso's denial that back-up files exist, El Paso's witnesses testified that, for many if not all items in the tax pool analysis, supporting memoranda can be found in various "subject" files scattered in the Tax Department. The summons seeks these memoranda in addition to the four to five page list.

The second sentence of the clarification of the summons is considerably less lucid. The language "tax problems or potential tax liabilities" had stimulated El Paso's original concerns about the breadth of the summons. At trial, the IRS represented that this language could be faithfully recast in the words used in El Paso's affidavit.

The IRS is bound by this representation. The affidavit, as we have seen, only borrows the IRS's own definition of tax pool analysis. This circle of definitions brings us back to square one. We are unable to give content to the second part of the IRS clarification in any fashion that avoids duplication of the first part.[5]

We conclude, therefore, that the judgment reaches only the tax pool analysis, as described herein, and the memoranda contained in various subject files that were used to prepare the tax pool analysis. On that understanding of the judgment, we proceed to the merits of this appeal.

## IV.

■ The IRS exercised its summons power in this case under 26 U.S.C. § 7602. That section authorizes the IRS "[t]o examine any books, papers, records, or other data which may be relevant" to determining the correctness of the return. Under the Supreme Court's seminal decision in *United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), the IRS need not show probable cause to obtain judicial enforcement of the summons. Rather, the government need only make a preliminary showing that

"The investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed. . . ."

379 U.S. at 57–58, 85 S.Ct. at 254–55; *United States v. Grayson County State Bank*, 656 F.2d 1070, 1073 (5th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1276, 71 L.Ed.2d 460 (1982).

■ As we observed in *United States v. Davis*, 636 F.2d 1028 (5th Cir. 1981),

Once the government has satisfied this minimal requirement, the burden shifts

---

5. In fact, the second part of the clarification is theoretically narrower than the first because it is restricted to documents created in or re-ferred to the Tax Department or the Department's superiors.

to the summonee either to disprove one of the four elements of the government's prima facie showing or to demonstrate that judicial enforcement of the summons would otherwise constitute an abuse of the court's process.

636 F.2d at 1034.

El Paso argues that the tax pool analysis summons is not relevant to any legitimate IRS inquiry. In El Paso's view, the tax pool analysis represents "a compilation of opinion and speculation on the adequacy of the provision for taxes shown on El Paso's financial statements." Containing no source documents with the details of actual transactions, the tax pool analysis is only a forecast of contingent tax liabilities prepared for the company's financial sheets. El Paso concedes that the IRS has a right to factual information upon which the return is based, but denies that the taxpayer's predictions about the outcome of an audit have any bearing on the correctness of the return as filed. El Paso relies heavily on *United States v. Coopers & Lybrand*, 550 F.2d 615 (10th Cir. 1977), in which the court denied the relevance of a tax pool analysis to an IRS investigation.

 We reject the view that the tax pool analysis fails the relevance test. An IRS summons is not judged by the relevance standards used in deciding whether to admit evidence in court. Rather, the well-established test is "whether the summons seeks information which 'might throw light upon the correctness of the taxpayer's return.'" *United States v. Wyatt*, 637 F.2d 293, 300 (5th Cir. 1981) (upholding the relevance of the so-called "eleven questions" designed to ferret out information on corporate payment of bribes). *See also United States v. Noall*, 587 F.2d 123, 125 (2d Cir. 1978) *cert. denied*, 441 U.S. 923, 99 S.Ct.

2031, 60 L.Ed.2d 396 (1979) (upholding the relevance of internal-audit work papers).

The IRS seeks here El Paso's assessment of the questionable positions it took on its return, an assessment prepared for financial reporting purposes. That the tax pool analysis is neither used in preparing a return nor is a "source document" of an actual transaction does not bar a finding of relevance.[6] A tax return is much more than a tabulation of transactions neatly fitted into an existing structure of tax concepts. The return largely represents an interpretation of transactions in the light most favorable to the taxpayer. The task of the Service in determining whether the return is correct is not only to verify the existence of the actual transactions cumulatively recorded in the return. The IRS must also determine whether the taxpayer has stretched a tax concept to cover a transaction to which the concept does not apply. Documents that focus and concentrate the Service's energy on questionable positions in the return, therefore, are highly relevant. It is, in fact, hard to imagine a document more likely to shed light on the correctness of those aspects of a return that harbor doubts than the tax pool analysis.

Our holding accords with the similar conclusion on the relevance of tax-accrual work papers recently reached by the Second Circuit in *United States v. Arthur Young & Co.*, 677 F.2d 211 (2d Cir. 1982). Facing an argument that tax-accrual work papers prepared by an independent auditor are not relevant, the court succinctly stated "[d]ifferent tax positions lead to different amounts of liability. It is difficult to say that the assessment by the independent auditor of the correctness of positions taken by the taxpayer in his return would not throw 'light upon' the correctness of his return." 677 F.2d at 219.[7] We agree with

6. *See United States v. Euge*, 444 U.S. 707, 100 S.Ct. 874, 63 L.Ed.2d 141 (1980) (upholding the IRS's power to compel the execution of a handwriting exemplar); *United States v. Noall*, 587 F.2d at 126 (IRS may summon internal audit reports prepared after the return was filed).

7. Although the *Arthur Young* court found tax-accrual workpapers relevant, the court declined

to enforce production of them. The court held that the workpapers were shielded by an accountant work product doctrine that was necessary to fulfill the purposes of the securities laws in demanding accurate financial statements. 677 F.2d at 219–21. We need not reach the issue of an accountant work product doctrine because the IRS here summoned the

this view and hold that the tax pool analysis is relevant to an IRS audit.

## V.

■ We now turn to El Paso's contention that the tax pool analysis is shielded by the attorney-client privilege. El Paso carries the burden of establishing this defense to the enforcement of the summons. *United States v. Powell*, 379 U.S. at 58, 85 S.Ct. at 255; *United States v. Davis*, 636 F.2d at 1034.

■ In *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), the Supreme Court delineated the purpose of the attorney-client privilege.[8]

The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. 8 Wigmore, Evidence § 2290 (McNaughton Rev. 1961). Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client. As we stated last term in *Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 913, 63 L.Ed.2d

186 (1980), "the attorney-client privilege rests on the need for the advocating counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." And in *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976), we recognized the purpose of the privilege to be "to encourage clients to make full disclosures to their attorneys."

*Id.* 101 S.Ct. at 682.

■ The scope of the attorney-client privilege is shaped by its purposes. *United States v. Pipkins*, 528 F.2d 559, 563 (5th Cir. 1976), *cert. denied*, 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976). While the elements of the privilege have been comprehensively restated elsewhere,[9] it is sufficient here to note that "[w]hat is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer*." *United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) (emphasis in original). *See United States v. Miller*, 660 F.2d 563 (5th Cir. 1981); *Colton v. United States*, 306 F.2d 633, 637 (2d Cir. 1962), *cert. denied*, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963). Moreover, "disclosure of any significant portion of a confidential communication waives the privilege as to the whole." *United States v. Davis*, 636 at 1043 n.18.[10]

tax pool analysis from the taxpayer itself, not from an independent accountant.

**8.** In *Upjohn* the IRS summoned the files of a corporate taxpayer's general counsel on the counsel's investigation of illegal foreign payments made by the corporation. The Court held that the attorney-client privilege protected the files whether or not the client communications therein were made by the corporation's "control group." Because the purpose of the attorney-client privilege is to promote the flow of information to the attorney to enable him to give informed legal advice, communications from lower echelon employees were within the privilege as long as the communications were made to the attorney to assist him in giving legal advice to the client corporation. 101 S.Ct. at 682–86.

**9.** *See* 8 J. Wigmore Evidence § 2292 at 554 (J. McNaughton rev. 1961):

(1) Where legal advice of any kind is sought; (2) from a professional legal advisor

in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at his instance permanently protected; (7) from disclosure by himself or by the legal advisor; (8) except the protection be waived.

*See generally* Petersen, Attorney Client Privilege and Internal Revenue Service Investigations, 54 Minn.L.Rev. 67 (1969).

**10.** The Sixth Circuit might take a different view of disclosure, *see United States v. Upjohn Co.*, 600 F.2d 1223, 1227 n.12 (6th Cir. 1979) ("the corporation's voluntary disclosure to the SEC amounts to a waiver of the privilege only with respect to the facts actually disclosed"), *rev'd*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The Supreme Court in *Upjohn* noted the Sixth Circuit's treatment of the waiver issue but did not discuss or decide it, *see* 101 S.Ct. at 682.

The revelations to the SEC made in *Upjohn* were facts concerning foreign payments. The

Finally, we have made clear that the attorney-client privilege may not be tossed as a blanket over an undifferentiated group of documents. *United States v. Davis*, 636 F.2d at 1044 n. 20; *United States v. Roundtree*, 420 F.2d 845, 852 (5th Cir. 1969). The privilege must be specifically asserted with respect to particular documents.

The IRS argues that El Paso has failed to prove any of the elements of the attorney-client privilege. In its broadest theory, the IRS urges that preparing the tax pool analysis is not legal work and that El Paso's attorneys in performing it are not giving legal advice. In the IRS's view the tax pool analysis is a business document, drawn up solely to bring the company's financial statements in line with generally accepted auditing principles. Because the tax pool analysis simply supports a record of the corporation's finances, the IRS sees it as business work rather than legal work.

■■■ The line between accounting work and legal work in the giving of tax advice is extremely difficult to draw. *See* Kenderdine, The Internal Revenue Service Summons to Produce Documents: Powers, Procedures & Taxpayer Defenses, 64 Minn.L. Rev. 73, 100–01 (1979). We have held that the preparation of tax returns is generally not legal advice within the scope of the privilege. *United States v. Davis*, 636 F.2d at 1043. *See Canaday v. United States*, 354 F.2d 849 (8th Cir. 1966); *Olender v. United States*, 210 F.2d 795, 805–06 (9th Cir. 1954), *cert. denied*, 352 U.S. 982, 77 S.Ct. 382, 1 L.Ed.2d 365 (1957). *Davis* withheld the privilege from communications made to an attorney to prepare a tax return because such work is primarily an accounting service. The tax pool analysis may also be considered an accounting service since it is often performed by accountants, *see* Diss & Hanson, Tax Contingency Audit Work Papers: Current Developments, Observations, and Proposals, Tax Advisor 104 (Feb. 1981).

Nevertheless, we would be reluctant to hold that a lawyer's analysis of the soft spots in a tax return and his judgments on the outcome of litigation on it are not legal advice. We need not decide this issue, however, because we believe that El Paso's attempt to claim the privilege fails on other grounds.

■■■ To retain the attorney-client privilege, the confidentiality surrounding the communications made in that relationship must be preserved. The purpose of the privilege is to foster full client disclosure to the lawyer; the privilege exists to assure the client that his private disclosures will not become common knowledge. The need to cloak these communications with secrecy, however, ends when the secrets pass through the client's lips to others. Thus, a breach of confidentiality forfeits the client's right to claim the privilege. *Permian Corp. v. United States*, 665 F.2d 1214, 1219 (D.C. Cir.1981) (when confidential communications are voluntarily disclosed to one person, the privilege is waived as to all others); *United States v. Miller, supra* (previous delivery of accounting books to the IRS robbed them of the confidentiality needed to maintain the attorney-client privilege); McCormick on Evidence § 93 (2d ed. 1972). As Justice Holmes wrote when a member of the Massachusetts Supreme Court,

> [T]he privacy for the sake of which the privilege was created was gone by the appellant's own consent, and the privilege does not remain in such circumstances for the mere sake of giving the client an additional weapon to use or not at his choice.

*Green v. Crapo*, 181 Mass. 55, 62 N.E. 956, 959 (1902).

■■■■ The district court found in this case that El Paso discussed "some of the information and many of the potential tax liability issues" in its tax pool analysis with

---

attorney-client privilege does not protect against discovery of underlying facts from their source merely because those facts have been communicated to an attorney. 101 S.Ct. at 685–86. The public disclosure of those facts, moreover, does not destroy the privilege with

respect to attorney-client communications about those facts. Thus, it is not clear that the Sixth Circuit was concerned in *Upjohn* with a potential divulgence of a confidential communication.

the independent auditors who certify the corporation's books. This finding is not clearly erroneous.[11] *Pullman-Standard v. Swint*, —— U.S. ——, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). The evidence showed that in the course of the audit, the accountants determine whether the company has set aside an adequate reserve for contingent taxes. This task carries the auditors into the tax pool analysis and into at least some of the supporting memoranda. Confidentiality as to these documents is neither expected nor preserved, for they are created with the knowledge that independent accountants may need access to them to complete the audit. *See United States v. Pipkins*, 528 F.2d at 563.

■■■ El Paso generates the tax pool analysis to portray its financial condition accurately. As the securities laws require, independent accountants then verify the financial statements by probing the corporation's reasons for allocating a given amount to its noncurrent tax account.[12] In El Paso's case, the tax pool analysis is revealed to the independent accountants as part of their audit. Our Circuit does not recognize an accountant-client communications privi-

lege, *United States v. Davis*, 636 F.2d at 1043; *Falsone v. United States*, 205 F.2d 734 (5th Cir. 1953), *cert. denied*, 346 U.S. 864, 74 S.Ct. 103, 98 L.Ed. 375 (1953), and, as the Supreme Court has acknowledged, neither does any other federal court. *Couch v. United States*, 409 U.S. 322, 335, 93 S.Ct. 611, 619, 34 L.Ed.2d 548 (1973) (". . . we note that no confidential accountant client privilege exists under federal law, and no state created privilege has been recognized in federal cases. . . ."); 2 J. Weinstein & M. Burger, Weinstein's Evidence ¶ 503(a)(3)[01] (1981). Under these circumstances, El Paso's disclosure of the tax pool analysis to the auditors destroys confidentiality with respect to it. With the destruction of confidentiality goes as well the right to claim the attorney-client privilege.

We recognize that the Second Circuit has denied enforcement of IRS summons to the taxpayer's accountant seeking tax accrual workpapers that the accountant has prepared. *United States v. Arthur Young & Co.*, *supra*. The logic of *Arthur Young* implies that the taxpayer's revelation of tax accrual workpapers to an accountant should be

---

11. El Paso urges us to give less deference to the district court's findings than Fed.R.Civ.P. 52(a) indicates because the findings were prepared by the IRS and adopted verbatim by the court. Trial courts in this Circuit frequently adopt findings of fact prepared by counsel. This circumstance alone does not strip the findings of the protection of the clearly erroneous rule. When "[t]he record reflects that the trial court fully comprehended the factual and legal issues and adequately performed the 'decision reaching process'" the clearly erroneous rule applies with full force to findings of fact prepared by the parties and adopted by the court. *Odeco, Inc. v. Avondale Shipyards, Inc.*, 663 F.2d 650, 652–53 (5th Cir. 1981), *quoting, Kaspar Wireworks, Inc. v. Leco Eng. & Mach., Inc.*, 575 F.2d 530, 543 (5th Cir. 1978).

We have reviewed the record in this case and conclude that the trial court more than adequately performed its role as decision maker. The court played an active part throughout the trial in sharpening the issues and bringing out the evidence. At the close of the case, the court made oral findings of fact and conclusions of law, and directed the IRS to prepare findings and conclusions in accord with them. Moreover, the record reflects that the trial judge's findings rest in part on his assessment

of the relative credibility of the witnesses. We, therefore, give the district court's findings the deference that Rule 52(a) mandates.

12. The *Arthur Young* court gave the following description of the auditing process:

[G]enerally accepted auditing standards require an auditor to determine whether his client has put aside enough reserves to cover the contingency that upon audit it will owe the government more taxes than originally remitted. To make this assessment, the auditor must determine not only how the taxpayer treated his income and expenses in his tax return; he must also decide whether that treatment comports favorably with the Internal Revenue Code, the regulations, and the case law. In areas where the law is unclear, he must predict the chances that the taxpayer's position will be upheld by the courts—a judgment based on his knowledge of the law and his opinion of where the law is headed. The auditor must also take into account the likelihood that the client will settle the dispute—a judgment based on the auditor's confidential and intimate knowledge of the client.

677 F.2d at 217.

considered a communication in confidence.[13] *Arthur Young* does not persuade us, however, that El Paso's disclosure of its tax pool analysis to its independent accountants is consistent with the confidentiality required to assert the attorney-client privilege. To extend *Arthur Young* to this case would, in effect, create an accountant-client communications privilege. No such privilege exists under federal law, however, as we noted above. In the absence of a contrary rule established by law, we cannot view El Paso's discussions with its auditors as confidential. The attorney-client privilege is, therefore, waived.

■ We believe that El Paso may not withdraw behind the shield of the attorney-client privilege for an additional reason. El Paso failed to particularize its assertion of the privilege and prove its case with respect to any specific document. El Paso made only a blanket assertion of the privilege as to all documents in, or backing up, its tax pool analysis. Such a showing is simply inadequate.

In *United States v. Davis*, we reiterated the unacceptability of blanket assertions of the attorney-client privilege. 636 F.2d at 1044 n.20. Such assertions disable the court and the adversary party from testing the merits of the claim of privilege. In *Davis* we relaxed the rule because of confusion about when the attorney-client privilege should be raised in a tax summons enforcement proceeding. We cautioned, however, that "future litigants who make only blanket assertions of privilege at enforcement proceedings should not expect such grace." *Id.* El Paso had fair notice of the obligation to make its privilege claim precise.[14] We cannot excuse its failure to do so.

The reasons for refusing to tolerate blanket assertions of the privilege apply fully to this case. El Paso's tax department employs eighty accountants and ten attorneys. The tax department as a whole has responsibility for preparing the various memoranda that underpin the tax pool analysis. Both the head of the tax department and the general counsel testified at the enforcement hearing, but neither witness had reviewed the backup memoranda prior to testifying. As a result, neither was able to state how many or which memoranda were prepared by attorneys rather than by accountants.

■ El Paso's failure to prove which documents were prepared by attorneys considerably undermines its claim to the attorney-client privilege. Because the privilege does not attach to tax work prepared by accountants unless the accountant is translating complex tax terms into a form intelligible to a lawyer at the lawyer's behest, *United States v. Kovel*, 296 F.2d at 922, the memoranda prepared by accountants do not qualify for the privilege. We cannot say that any single memorandum in the El Paso's tax department is stamped with an attorney's seal. A general claim that the tax department funnels tax work through its attorneys will not do, and El Paso's proof amounted to little more.

---

**13.** The *Arthur Young* court reasoned that if the IRS could reach tax accrual workpapers prepared by accountants, taxpayers might conceal their tax vulnerabilities from the accountants. The concealment, in turn, would impair the accuracy of financial statements and the ability of investors to rely on them. In the Second Circuit's view, this result would run counter to the policy of the securities laws to guard investors against flawed financial information. Accordingly, the Second Circuit fashioned an accountant's work-product rule for tax accrual workpapers. 677 F.2d at 221.

To the extent that the Second Circuit wished to encourage companies to reveal freely their tax vulnerabilities to independent accountants, the *Arthur Young* rule implicitly strives to shelter the confidentiality of the taxpayer's communications to the accountant about the noncurrent tax account. *See Arthur Young*, 677 F.2d at 223 n.5 (dissenting opinion observing that the *Arthur Young* holding is grounded on policies more germane to a client-communications confidentiality rule than an accountant's work-product rule). Thus, if we were to adopt the reasoning of *Arthur Young*, a question would arise whether the El Paso's communications to its accountants were confidential, and, therefore, not in breach of the confidentiality necessary to assert the attorney-client privilege.

**14.** *United States v. Davis* was decided on February 12, 1981; the government filed its enforcement petition in this case on May 27, 1981.

We hold, therefore, that El Paso has breached the confidentiality needed to shield its attorney-client communications, and in any event, has failed to meet its burden to assert the privilege specifically. The attorney-client privilege does not protect El Paso against disclosing the documents that the IRS seeks.

## VI.

■ El. Paso next contends that the work product doctrine immunizes the tax pool analysis from production.[15] It is settled, of course, that a work product defense may be asserted against enforcement of an IRS summons. *Upjohn Co. v. United States*, 101 S.Ct. at 686.

The work product doctrine traces its lineage to the Supreme Court's decision in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). In *Hickman*, the plaintiff's attorney sought to discover notes that the defendant's attorney had taken in interviews of prospective witnesses in preparation for trial. The Court rejected this discovery attempt, which was made without any special showing of need. The Court held that the work of preparing for trial demands insulation from opposing counsel's inquiries on a lawyer's research, analysis, legal theories, and mental impressions. To adopt a more lenient approach to discovery of an attorney's work product would deter lawyers from committing to paper their work in preparation for trial and would thus diminish the quality of representation. Moreover, the invasion of a lawyer's private thoughts would demoralize the profession. 329 U.S. at 510–512, 67 S.Ct. at 393–94. "An attorney's thoughts, hithertofore inviolate, would not be his own." *Id.* at 511, 67 S.Ct. at 393–94.

The accent in *Hickman* was on a lawyer's need for a sphere of privacy in preparing a lawsuit. "At its core, the work product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975) (applying the work product doctrine to criminal trials).

■ The work product doctrine is not an umbrella that shades all materials prepared by a lawyer, however. The work product doctrine focuses only on materials assembled and brought into being in anticipation of litigation. Excluded from work product materials, as the advisory committee notes to Rule 26(b)(3) make clear, are "[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation...." 48 F.R.D. at 501.

■ Even assuming that El Paso's tax pool analysis otherwise qualifies for work product protection, we hold the doctrine unavailable here because the tax pool analysis is not prepared "in anticipation of litigation." But in doing so we concede that determining whether a document is prepared in anticipation of litigation is a slippery task. *See In Re Grand Jury Investigation*, 599 F.2d 1224, 1229 (3d Cir. 1979); 8 C. Wright & A. Miller, Federal Prac. & Pro. § 2024 at 198 (1970). In *United States v. Davis* we phrased the test in the following terms: "[L]itigation need not be imminent ... as long as the primary motivating purpose behind the creation of the document was to aid in possible future litigation."

**15.** The work product doctrine is embodied in Federal Rule of Civil Procedure 26(b)(3) which provides:

"*Trial Preparation: Materials* Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insuror, or

agent). Only upon a showing that the parties seeking discovery have substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means in ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

636 F.2d at 1040. *Davis* held that an attorney's work in preparing a tax return did not fall under the work product doctrine because the work was not primarily motivated to assist in future litigation over the return. We reach a similar conclusion with respect to El Paso's tax pool analysis.

El Paso establishes its non-current tax account to bring its financial books into conformity with generally accepted auditing principles. The desire to please the accountants, in turn, is compelled by the securities laws. The primary motivating force behind the tax pool analysis, therefore, is not to ready El Paso for litigation over its tax returns. Rather, the primary motivation is to anticipate, for financial reporting purposes, what the impact of litigation might be on the company's tax liability. El Paso thus creates the tax pool analysis with an eye on its business needs, not on its legal ones.

We recognize that the tax pool analysis involves weighing legal arguments, predicting the stance of the IRS, and forecasting the ultimate likelihood of sustaining El Paso's position in court. Nevertheless, this analysis (assuming it is legal rather than accounting work) is only a means to a business end. The legal analysis is not an end in itself: the memoranda underlying the tax pool analysis do not map out El Paso's actual litigating strategy, should litigation occur. In fact, no single item in the tax pool analysis is specifically under scrutiny by the IRS when the memoranda are drafted. *Cf. Kent Corp. v. NLRB*, 530 F.2d 612, 123 (5th Cir. 1976), *cert. denied*, 429 U.S. 920, 97 S.Ct. 316, 50 L.Ed.2d 287 (1976) (investigation reports of the NLRB prepared after a charge has been filed are the NLRB attorney's work product because the charge contemplates litigation). Business imperatives, not the press of litigation, call these documents into being.

Moreover, El Paso's tax litigation is handled by outside counsel. *Cf. United States v. Gates*, 35 F.R.D. 524 (D.Colo.1964) (IRS documentary files on the taxpayer were not work product when referred to Justice Department attorneys who were prosecuting a tax suit against the taxpayer). Although an attorney from El Paso's tax department serves as co-counsel, outside counsel takes the lead in directing the conduct of El Paso's tax suits. There is no evidence in the record that the tax pool analysis or underlying memoranda are referred to outside counsel or used by El Paso's attorneys to prepare for trial or negotiations.

In tax refund suits against the United States, documents generated by the IRS in connection with its defense have been denied work product protection even though much more closely tied to litigation then El Paso's tax pool analysis. *Abel Investment Co. v. United States*, 53 F.R.D. 485 (D.Neb. 1971); *Peterson v. United States*, 52 F.R.D. 317 (S.D.Ill.1971); *United States v. San Antonio Portland Cement Co.*, 33 F.R.D. 513 (W.D.Tex.1963). In *Abel Investment*, the court denied the work product privilege to documents prepared by the IRS in response to a tax refund claim made by the taxpayer. The documents impartially evaluated the strengths and weaknesses of the IRS's and the taxpayer's positions. The court held that the documents were not prepared in anticipation of litigation.

In support of its conclusion, the *Abel Investment* court observed that the reports were prepared routinely before any lawsuit began and were not developed by the attorney who would try the case, should litigation ensure. Moreover, "[t]he documents in all probability do not fix the government's theory of the case to be used at trial, because trial counsel should and undoubtedly would set the defense from all available facts and theories whether or not conceived or expressed by personnel at the various stages of the settlement process...." 53 F.R.D. at 49. El Paso's tax pool analysis is even more distant from actual litigation than the IRS documents in *Abel Investment*. The factors mentioned in *Abel Investment* also point to a denial of work product protection here.

In sum, we believe that the tax pool analysis does not contemplate litigation in the sense required to bring it within the work product doctrine. The tax pool analy-

sis concocts theories about the results of possible litigation; such analyses are not designed to prepare a specific case for trial or negotiation. Their sole function, from all that appears in the record, is to back up a figure on a financial balance sheet. Written ultimately to comply with SEC regulations, the tax pool analysis carries much more the aura of daily business than it does of courtroom combat. We hold, therefore, that the tax pool analysis and backup memoranda are not protected work product materials.

## VII.

█ El Paso contends that we should refuse to enforce the tax pool analysis summons, even though it seeks otherwise relevant and nonprivileged documents, on grounds of public policy. El Paso urges us to constrict the sweep of the IRS summons power because of the policy of the securities laws. To permit routine summoning of tax pool analyses from companies will have a chilling effect on the companies' willingness to prepare such analyses searchingly and critically. Moreover, companies will conceal tax pool analyses from their auditors and thereby thwart the accountants' attempts to measure the adequacy of the contingent tax accounts. These consequences obstruct the full and frank disclosure of financial information that the securities laws envision. The public policy of protecting investors, therefore, demands that we deny the IRS access to a company's tax pool analysis.

We are not swayed by the argument that the public policy of the securities laws implicitly overrides the clear grant of summons power to the IRS. While the IRS does not enjoy untrammeled authority to direct the production of documents, see *Upjohn Co., supra,* (attorney-client privilege and work product doctrine are defenses to the enforcement of the summons in proper cases); *United States v. LaSalle National*

*Bank,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978) (good faith requirements); *United States v. Powell, supra,* Congress has endowed the IRS with broad authority to conduct tax investigations. The Supreme Court has "consistently construed congressional intent to require that if the summons authority claimed is necessary for the effective performance of congressionally imposed responsibilities to enforce the tax code, that authority should be upheld absent express statutory prohibition or substantial countervailing policies." *United States v. Euge,* 100 S.Ct. at 878; *United States v. Bisceglia,* 420 U.S. 141, 95 S.Ct. 915, 43 L.Ed.2d 88 (1975). We are unwilling to make inroads in the plainly-announced congressional policy to allow the IRS broad access to relevant, nonprivileged documents on the basis of El Paso's claim of a conflict with the policies underlying the securities laws.

The main premise of El Paso's argument is that the accuracy of financial reports will suffer if companies must divulge their tax pool analyses to the IRS. We find this premise wholly speculative. El Paso paints a picture of corporations evading their responsibilities under the securities laws to prepare their financial books properly and to lay open their books and records to independent auditors. We do not join El Paso in assuming that corporations will dishonor their legal obligations by discontinuing the preparation of tax pool analyses. El Paso fails to recognize that "[i]f the corporation blocks the efforts of the accountants to ascertain the true state of the company's contingent tax liabilities, the accountant would be obligated to decline to certify the financial statements." *United States v. Arthur Young,* 677 F.2d at 224 (dissenting opinion). The powers of the SEC suffice to ensure that companies will comply with law.[16]

---

**16.** El Paso relies on the Supreme Court's refusal in *Upjohn* to narrow the attorney-client privilege simply because, as the government argued, corporations facing the risk of criminal liability have an adequate incentive to investigate wrongdoing even without the attorney-client privilege. The Court stated that the government's argument "ignores the fact that the depth and quality of any investigations to insure compliance with the law would suffer, even if they were undertaken. 101 S.Ct. at 684 n.2.

We note as well that Congress granted the IRS "broad latitude to adopt enforcement techniques helpful in the performance of . . . tax collection and assessment. . . ." *United States v. Euge,* 100 S.Ct. at 880 n.9. This latitude enables the IRS, without judicial intervention, to temper the perceived ill-effects of summoning tax pool analyses. The IRS has recognized resistance to the production of tax-pool analyses and responded by tightening its internal requirements for the issuance of such summonses. *See* Internal Revenue Manual § 4024.4 (Guidelines for Requesting Audit or Tax Accrual Workpapers) (May 14, 1981). These guidelines have no retroactive effect on the IRS' power to summon the tax pool analysis in this case. They do, however, evidence administrative sensitivity to the concerns evoked by routinely summoning a company's tax pool analysis. This demonstration of administrative flexibility reenforces our decision not to trim the IRS' authority irrevocably.

By upholding the IRS' authority to reach the tax pool analysis, we do not unleash an inquisition. The tax pool analysis may be useful to the IRS as a "roadmap" through a company's tax return; it is not, however, an admission of guilt. The actual tax liability of El Paso is hammered out in negotiations and ultimately is subject to resolution in the courts. We therefore decline to hamper the efficiency that access to the tax pool analysis can bring to an IRS audit.

In the absence of a more profound clash between congressional policies, we cannot cut back on the summons power that Congress has given to the Service. We do not feel free to reweave the fabric of national legislation in accord with our notions of how various statutory schemes mesh. Such policy choices belong to the Congress. Accordingly, we find no public policy barrier to the enforcement of this summons.

The Supreme Court used this argument to sustain the attorney-client privilege, a traditional and well-established feature of the legal landscape. That the centuries-old attorney-client privilege should not be toppled does not imply, however, that we should raise a new barrier, on shaky grounds, to IRS investigations. We find completely valid a distinction between the at-

## CONCLUSION

Our tax collection system depends primarily on the voluntary compliance of taxpayers acting in good faith. Congress has chosen to enforce this system of self-assessment through an agency vested with broad investigatory powers. The enforcement of the revenue laws contemplates that the IRS may verify the basis of a return by a thorough audit of a taxpayer's records. Certainly, IRS access to a document, prepared for business reasons, that guides and channels the Service's energy and limited resources to those areas of the return deserving of special scrutiny fits within the congressional scheme of tax enforcement. Because we find the summons here to be authorized by Congress and not otherwise prohibited, we enforce the tax pool analysis summons.

We restate our holdings. First, we interpret the judgment to extend only to El Paso's tax pool analysis and supporting memoranda in various subject files. Second, we do not find El Paso's tax pool analysis shielded by the attorney-client privilege. Third, the documents in question are not protected work product materials. Fourth, we find a lack of public policy in the securities laws demanding that we deny enforcement. The stay of the district court's judgment is lifted, and the judgment is

AFFIRMED.

GARWOOD, Circuit Judge, dissenting.

I respectfully dissent.

The Internal Revenue Service ("IRS" or "Service") did not issue the summonses for El Paso's tax pool analysis to investigate fraud or negligence, nor to determine or discover any information respecting the ac-

torney-client privilege and the confidentiality of a tax pool analysis that recognizes that while consultation with an attorney is a private and voluntary act, the preparation of a tax pool analysis is ultimately compelled by the SEC. *See Arthur Young,* 677 F.2d at 224 (dissenting opinion).

tual receipts, disbursements or transactions engaged in by El Paso, the accuracy and completeness of its records, or any other *factual* information respecting El Paso's tax liability or the correctness of its return.[1] On the contrary, it is evident that the sole purpose of the summonses was to discover the *post-return* "private thoughts and theories of the taxpayer"[2] and "the thinking of [its] accounting analysts and policy makers about tax decisions."[3] Further, it is apparent that the IRS does not seek these theories and opinions of the taxpayer concerning its prior taxes because they may be relevant to the *actual* correctness of El Paso's returns or the *actual* amount of tax owed. The Service asserts no such potential relevance here. Rather, as the majority candidly recognizes, the taxpayer's theories and opinions are sought merely because they may "focus and concentrate the Service's energy," "may be useful to the IRS as a 'road map' through a company's tax return," and will enhance "the efficiency" of the "IRS audit." Accordingly, here the bottom line is *not* figures or facts or even opinions; it is, rather, *the convenience of the Service.* That will not suffice. *United States v. Coopers & Lybrand*, 550 F.2d 615,

621 (10th Cir. 1977); *United States v. Matras*, 487 F.2d 1271, 1275 (8th ·Cir. 1973) ("The term 'relevant' connotes and encompasses more than 'convenience.' ... [T]he government failed to sustain its burden of proof by alleging a general need for a 'road map.' ").

A court should not enforce these summonses unless authority for them exists in the following portions of 26 U.S.C. § 7602:

"For the purpose of ascertaining the correctness of any return, ... [or] determining the liability of any person for any internal revenue tax, ... the Secretary is authorized—

"(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry; ..."

The statute requires, first, a showing of potential relevance.[4] The matter to which the examined books or data must be potentially relevant is "such inquiry." It appears that Congress used "inquiry" here in the sense of "question," to refer to the *subject matter* inquired about rather than the process or performance of investigation to elicit the correct answer to the question.[5] Ac-

---

1. I agree with the majority's analysis of the scope of the district court's enforcement order.

2. *United States v. Coopers & Lybrand*, 413 F.Supp. 942, 950 (D.Colo.1975), aff'd, 550 F.2d 615, 618 (10th Cir. 1977).

3. *United States v. Arthur Andersen & Co.*, 623 F.2d 725, 729 (1st Cir. 1980).

4. In the phrase "may be relevant or material," use of the words "may be" rather than "is" denotes that potential, as distinguished from actual, relevance is the test. Potential relevance is specified "since the Commissioner cannot be certain that the documents are relevant or material until he sees them." *United States v. Noall*, 587 F.2d 123, 125 (2d Cir. 1978), cert. denied, 441 U.S. 923, 99 S.Ct. 2031, 60 L.Ed.2d 396 (1979).

 *However,* the words "may be" are *not* used to define the character of relationship denoted by "relevant," nor to attenuate or dilute the nexus that "relevant" implies. Rather, the expression "may be" serves merely to inform us that the Service need not establish in advance the existence of the requisite relevance or nexus to a certainty, but only to some lesser degree of likelihood. Moreover, "may be" tells us

nothing about the identity of that to which the books and other data must be likely relevant.

 The decisions do not make a distinction in this regard between "relevant" and "material." *See, e.g., United States v. Powell*, 379 U.S. 48, 57, 85 S.Ct. 248, 255, 13 L.Ed.2d 112, 119 (1964) (Commissioner "must show that the investigation will be conducted pursuant to a legitimate purpose, [and] that the inquiry may be relevant to the purpose, ..."); *United States v. Wyatt*, 637 F.2d 293, 300 (5th Cir. 1981) ("must be pursuant to and relevant to a legitimate purpose"; "the test of relevancy").

5. Section 7602(1) does not say relevant "to *making* such inquiry" or "to *performing* such inquiry," but simply "to such inquiry." And, if "inquiry" were used in the sense of the process or performance of investigation, then "necessary or convenient to" would be more appropriate wording than "relevant or material to." Indeed, to construe "inquiry" here as meaning the performance or process of investigation is necessarily to construe "relevant or material" as being the essential equivalent of· "convenient." As noted, courts have consistently rejected such a construction. *United States v. Coopers & Lybrand, supra; United States v. Matras, supra. See also United States v. Ar-*

cordingly, "such inquiry" or "such question" is properly understood as referring to the question of "the correctness of any return" or "the liability of any person for any internal revenue tax." Thus, the section means that the books, papers, records or other data which the Service may summon are only those that it seeks because of their potential relevance to the *correctness* of a return or the *liability* of any person for a tax, as opposed to those the Service seeks merely because they have the potential of facilitating or making more efficient the process of examination. In this case, the IRS clearly seeks the tax pool analysis for the latter purpose, not the former.

I have no doubt that a congressional desire to promote effective and efficient tax determination and collection played a substantial part in the decision to grant the Service the summons power provided for in sections 7602 and 7603. Nevertheless, what Congress said in essence was not that the Service would have summons power whenever it might facilitate the examination process, but rather that the process of tax determination and collection would be enhanced and facilitated by giving the Service the power to summon records and other data that might be relevant to the correctness of returns or the liability of persons for taxes. After all, for a great many years the Service effectively employed its summons power in routine audits (such as that involved here) of large corporate taxpayers without the necessity of attempting to acquire their "tax pool" analyses. The practice of attempting in cases of this kind to summon the tax pool analysis is almost

uniformly recognized as being both a qualitatively significant and a relatively recent expansion of the Service's prior practice. So far as I am aware, *Coopers & Lybrand* is the first appellate decision dealing with the question, and the instant case is the first appellate decision upholding the practice. One can hardly argue, then, that Congress must have intended to grant this power to the Service in enacting section 7602 because without it that section would be substantially deficient in providing for efficient and effective methods of ascertaining and collecting corporate taxes. In this connection, it is noteworthy that former Commissioner of Internal Revenue Mortimer Caplin, certainly a person fully familiar with the past practice and needs of the Service, has stated that the Service "should limit its requests to *only* those portions of the [tax pool analysis] workpapers containing *factual* information relevant to the tax audit."[6]

I recognize that this Court, in common with many others, has held that the general test for potential relevance of summonsed books or records is, as stated in *Foster v. United States*, 265 F.2d 183, 187 (2d Cir. 1959), *cert. denied*, 360 U.S. 912, 79 S.Ct. 1297, 3 L.Ed.2d 1261 (1960), "whether the inspection sought 'might have thrown light upon' the correctness of the taxpayer's returns."[7] *See United States v. Wyatt*, 637 F.2d 293, 300 (5th Cir. 1981). Nevertheless, virtually all these cases involve records sought because of their potential to provide *factual* information relating to the actual receipts, disbursements or transactions giving rise to the taxes in question.[8] That the

---

thur *Young & Co.*, 496 F.Supp. 1152, 1157 (S.D. N.Y.1980), *rev'd in part on other grounds*, 677 F.2d 211 (2d Cir. 1982).

6. Caplin, *Should the Service Be Permitted to Reach Accountants' Tax Accrual Workpapers?*, 51 J. Tax. 194, 199 (1979) (emphasis added).

7. However, so far as I am aware, this formulation has never been expressly adopted or approved by the Supreme Court.

8. As observed in Note, *A Balancing Approach to the Discoverability of Accountants' Tax Liability Workpapers*, 60 Wash.U. L.Q. 185, 195–96 (1982):

"Most of the courts construing relevance have dealt with records of the actual transactions that formed the basis of the income tax liability. The few cases in which the IRS has sought background materials that were either conjectural or only tangentially related to records of actual transactions have produced widely divergent results." (Footnotes omitted.)

For example, in *Wyatt* this Court pointed out:

taxpayer may not have based its return on this information does not, of course, change either its *factual* nature or the character of its relevance to the actual correctness of the return.[9] Further, courts facing the summons question in different contexts have somewhat narrowed the definition of "relevant" to require "a realistic expectation rather than an idle hope that something may be discovered." *United States v. Harrington*, 388 F.2d 520, 524 (2d Cir. 1968); *United States v. Wyatt*, 637 F.2d at 300–01. Now, the courts are called upon to apply the relevancy test in yet another context, that of a summons of the tax pool analysis for aid in a routine audit where the summons is not sought to procure factual data. In this situation, I believe that "throw light upon" means throw *factual* light upon.[10]

The context in which "relevant" appears enhances the propriety of this construction. It is "books, papers, records, or *other* data" that must be potentially relevant. The word "other" suggests that the books, papers, and records referenced are those whose contents share common general characteristics with or are analogous to "data." As former Commissioner Caplin has aptly observed respecting section 7602(1):

"Little discussion has taken place on the scope of the word 'data' as contained in that Section. What comes to mind in the

use of that term are items such as books, records and other factual materials—not opinions, projections, conjectures and other thought processes. Free access to accountants' tax accrual files, containing information of the second type, would be of obvious help to the IRS as a convenience, roadmap and time-saving device in carrying out its tax audit responsibility. But is it clear that Congress intended that that category of work product should be readily available to the IRS? Is there any evidence—to paraphrase Circuit Judge Sneed in *SEC v. Arthur Young & Co.*, 590 F.2d 785 (CA–9, 1979)— that Congress intended Section 7602 to be a 'conscription bill' to make the accounting profession 'an enforcement arm' of the IRS? It is hard to believe that even the most ardent in the IRS would strain the summons authority to fit the latter mold. As the Supreme Court reiterated in [*United States v.*] *Bisceglia*, 420 U.S. 141 [95 S.Ct. 915, 43 L.Ed.2d 88], (1975), the summons power of the IRS 'is a limited power and should be kept within its proper bounds.'" Caplin, note 6 *supra*, at 199–200.

Further, while *United States v. Powell*, 379 U.S. 48, 57–58, 85 S.Ct. 248, 255, 13 L.Ed.2d 112, 119 (1964), teaches us that section 7605(b)'s provision that "[n]o tax-

---

"The record clearly establishes that a prima facie showing of relevancy was made. Not only did the agent give examples of the types of transactions to which the questions were directed and how such transactions would affect the taxpayer's income tax liabilities, but detailed the need of the discovery and explanation of reported and unreported transactions." 637 F.2d at 301 (footnotes omitted).

**9.** Thus, in *Noall* the Second Circuit approved a summons for a conventional internal audit (not a tax pool analysis) although it was not used in *preparing* the returns:

"Clearly the purposes of the internal audit include the detection of overstatements or understatements of revenues or expenses.... If the internal auditors have ascertained an understatement of revenues or an overstatement of expenses, this plainly might throw light on the correctness of the returns. ... The Commissioner's interest lies in whether the tax returns correctly reflected [taxpayer] Bunge's actual income, not

simply whether they were correctly prepared from the books of account and other records used." 587 F.2d at 126.

Obviously when the Court says "might throw light" it means the "light" thrown by factual data, *e.g.*, an "*ascertained* ... understatement of revenues."

In *United States v. Euge*, 444 U.S. 707, 100 S.Ct. 874, 63 L.Ed.2d 141 (1980), the Court sustained a summons (under clause (3) of section 7602) requiring the taxpayer to appear and execute handwriting exemplars. Obviously, this did not relate to preparation of the returns being examined. Just as obviously, however, the relevance was *purely factual*—the agent was trying to verify whether the taxpayer was maintaining several bank accounts under aliases to conceal taxable income.

**10.** "Mental impressions, legal analysis, conclusions, and recommendations are generally not relevant." *P. T. & L. Construction Co. v. Comm'r*, 63 T.C. 404, 414 (1974).

payer shall be subjected to unnecessary examination or investigations" does not impose any character of "probable cause" requirement on the Service, the quoted language nonetheless appears to bespeak a congressional hostility to attenuated claims of relevance or to an expansion of "relevant" to include that which is in essence only for the convenience of the Service.

Of course, I recognize that the tax pool analysis may in some instances throw *factual* light upon the correctness of the return or the liability for tax. The opinions or knowledge of the taxpayer may be relevant *facts* in a fraud or negligence penalty case. And, it is not inconceivable that under certain circumstances the tax pool analysis may contain relevant factual data that is not otherwise available. A summons of the tax pool analysis for such a purpose would ordinarily meet the "may be relevant" test. However, under the *Powell* criteria, such information must not be "already within the Commissioner's possession," and must be potentially "relevant to the purpose" of the summons. 379 U.S. at 57–58, 85 S.Ct. at 254–55. Moreover, as noted, Congress has mandated that "[n]o taxpayer shall be subjected to unnecessary examination or investigation." 26 U.S.C. § 7605(b). Accordingly, we should not sustain a summons of a tax pool analysis, even if it may *incidentally* disclose some relevant data, when the Service's purpose, as here,[11] is *not* to elicit this data, but is rather to discover the taxpayer's post-return thought processes, theories, and opinions for use as a convenient road map in the performance of the audit of the return.

My views on the relevance of the tax pool analysis are, I believe, essentially those espoused by former Commissioner Caplin and are supported by the decision in *Coopers & Lybrand* and, inferentially, by the *Matras* opinion. I recognize, however, that they are at variance not only with those of my learned colleagues on this panel but also with those of the Second Circuit panel in *United States v. Arthur Young & Co.*, 677 F.2d 211 (2d Cir. 1982). Nevertheless, in *Arthur Young* a majority of the Court, recognizing the potentially far-ranging adverse consequences of its decision on relevance, felt it necessary to in effect create an auditor's work product privilege respecting the tax pool analysis. In my view, the Second Circuit's concerns are better accommodated by refusing to give an overly broad construction to the necessarily somewhat imprecise and flexible criteria embodied in section 7602(1).

Accordingly, I would hold that the IRS made an insufficient showing of potential relevance, and would therefore reverse the judgment below.

I agree with the majority that "El Paso failed to particularize its assertion of the [attorney-client] privilege and prove its case with respect to any specific document," and with so much of the majority opinion as concerns the denial on this ground of El Paso's attempt to defeat the summonses by invoking the attorney-client privilege. I also believe that essentially the same reasoning dictates denial of El Paso's attempt to invoke blanket work product protection against these summonses.[12]

11. During the course of this audit (which is presumably still in progress), the Service served on El Paso some 578 separate "Information Document Requests." Through August 1981, El Paso had complied with 529 of these; 29 were held for the agent to return or for additional information as to whether the agent in fact wanted the documents; 2 were later complied with; 5 were in some way involved in this proceeding. The IRS has not suggested any particular area for which it wishes to elicit information by its summonses of the tax pool analysis, or any particular need for the tax pool analysis other than as a convenient road map

through the entirety of the returns being audited.

12. However, I do not think the record here is sufficiently particularized to support the majority's apparent holding that *none* of the tax pool analysis and backup memoranda are work product materials. Surely it is not unlikely that, for example, some of the backup materials include memoranda generated in anticipation of possible litigation with the IRS, and that portions of the tax pool analysis are supported by such memoranda. Indeed, such memoranda may relate to ongoing litigation respecting problems in earlier years that are repeated in or affect the years in question. Accordingly,

I am concerned, however, with the majority's holding that El Paso *waived* any possible attorney-client privilege. Not only is this holding unnecessary to the result reached, but this case presents a particularly unfortunate context within which to make such a determination of waiver. Because we really have no information whatever respecting any asserted attorney-client communication, determining whether the privilege in regard thereto has been waived is virtually impossible (which is another good reason to deny blanket assertions of the privilege).

The majority bases its waiver holding on the district court's finding[13] that El Paso "*discussed* 'some of the information and *many* of the potential tax liability issues' in the tax pool analysis with the independent auditors." (Emphasis added.) The majority then asserts that the auditors' task "carries" them "into the tax pool analysis and into at least *some* of the supporting memoranda," which are not confidential since "they are created with the knowledge that independent accountants *may need* access to them." (Emphasis added).[14]

But what of the supporting memoranda and items in the tax pool analysis that are *not* discussed with or shown to the auditors? (The evidence and findings below indicate such items exist, and indeed that a substantial number of the "subject files" fell into this category.) Moreover, even regarding a subject file or tax pool item that has been "discussed" with the auditors, the scope of the waiver would appear to depend on the scope of the discussion. Surely not every discussion relating to a topic included in a file mandates a waiver of the entirety of every item in that file.[15] Footnote 18 in *United States v. Davis*, 636 F.2d 1028, 1043 (5th Cir.), *cert. denied*, 454 U.S. 862, 102 S.Ct. 320, 70 L.Ed.2d 162 (1981), is far too slender a reed to bear the full weight of such an extensive holding.[16] Nor does *United States v. Pipkins*, 528 F.2d 559, 563 (5th Cir.), *cert. denied*, 426 U.S. 952, 96 S.Ct. 3177, 49 L.Ed.2d 1191 (1976), provide significant guidance in this setting.[17]

Moreover, in my view substantial concerns argue in favor of holding that the attorney-client privilege is not waived by confidential disclosures to the client's independent auditors. Of course, as to information which the client intends the auditors to disclose to others or can anticipate a sub-

---

while I do not agree with the apparent inference that "if it's in the tax pool analysis or backup it can't be work product," I nevertheless recognize that El Paso cannot achieve work product protection merely by invoking a blanket claim and suggesting purely hypothetical examples.

**13.** I accept this finding, for the reasons stated by the majority.

**14.** The majority may be factually in error here. I believe the record indicates that generally the auditors were *not* furnished the original or copies of the actual tax pool analysis and its backup "subject" documents. Certain of these items were *discussed* with the auditors (as indicated by the trial court's findings), and if they desired further investigation or verification beyond that provided by the discussion, they went to the regular company transaction records or summaries instead of into the tax pool analysis files.

**15.** *See, e.g., United States v. Upjohn Co.*, 600 F.2d 1223, 1227 n. 12 (6th Cir. 1979), *rev'd on other grounds*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *United States v. Lipshy*, 492 F.Supp. 35, 44 (N.D.Tex.1979) (employee

communications made to attorney in connection with preparing report for corporate client on corporate wrongdoing; held that disclosure of the report to the IRS and of portions of it to the SEC did not waive the privilege as to "all details underlying the statement").

**16.** For example, a young man informs his mother that he was at the convenience store which was held up earlier in the evening. At her suggestion he sees Lawyer Jones, and on returning home his mother asks, "Did you tell Lawyer Jones you were at the store when it was held up?" He acknowledges that he did so. Has he thereby waived the privilege as to his entire conversation with Lawyer Jones respecting the occurrence at the store?

**17.** *Pipkins* involved handwriting samples the client gave a handwriting expert *retained by his* attorney. This Court rejected a claim of privilege, pointing out that Pipkins had "already voluntarily disclosed his handwriting style to the government," 528 F.2d at 563, and that "one's style of handwriting, readily observable by anyone, [is] not subject to the attorney-client privilege," 528 F.2d at 563 n. 2.

stantial possibility that such disclosure may be made in the proper fulfillment of the auditors' engagement, no such protection should exist. In a practical, operational sense the corporation and its outside auditor regard the information which the latter acquires in the course of its work, especially that within the scope of the attorney-client privilege, as fully confidential except insofar as the nature of the engagement contemplates the actual or likely disclosure of same to third parties. The reality of the matter is that for publicly held companies very little information can properly be held entirely confidential from independent auditors. If we do not take these realities into account in developing and applying theories of waiver of the attorney-client privilege in these situations, there is a substantial danger that the attorney-client privilege for publicly held corporations, so recently reaffirmed in *Upjohn Co. v. United States*, 449 U.S. 383, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), will become nothing but an empty theory. This danger is especially acute if courts broadly apply the concept of waiver of the entirety of a communication by the disclosure of any significant portion of it. Though informed by some of the same considerations, the suggestion here made does not create a new privilege or cover anywhere near as wide a range of communications as the rule adopted in *Arthur Young & Co.* Moreover, the restrictions on waiver hypothesized here are considerably narrower, and more in keeping with the concept of expected confidentiality, than the limited waiver approved in *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596, 611 (8th Cir. 1977) (en banc), involving material disclosed to a public body.[18] And, there is no reason to believe that the courts will be any less able to control abuse of the privilege in this context than they have been in others. *See, e.g., United States v. Woodall*, 438 F.2d 1317, 1324 (5th Cir. 1970) (en banc), *cert.*

denied, 403 U.S. 933, 91 S.Ct. 2262, 29 L.Ed.2d 712 (1971).

For these reasons I cannot accept the majority's blanket and unnecessary invocation of waiver of the attorney-client privilege in the context of this case.

The majority, as a part of its affirmance of the district court's judgment, lifts our previously granted stay of that judgment, in accordance with our normal practice. Of course, no motions for rehearing or for a continuation of the stay have yet been filed, and our mandate will not issue until action on a timely filed motion for rehearing, so the previously granted stay remains in effect at least until then. Accordingly, it is premature at this time to consider whether we should grant a further stay, and I do not understand the majority to prejudge that potential issue. I note, however, that compliance with the summons will moot further review, *United States v. Arthur Andersen & Co.*, 623 F.2d 720 (1st Cir. 1980), *cert. denied*, 449 U.S. 1021, 101 S.Ct. 588, 66 L.Ed.2d 483 (1980), that it does not appear a further stay will seriously affect the IRS, and that the instant decision, the first by an appellate court upholding an IRS tax pool analysis summons, is essentially contrary to the Tenth Circuit's holding in *Coopers & Lybrand*. Under these circumstances a further stay may be proper even if it were determined that the applicant's chances of success on the merits are not sufficiently strong as to be deemed "probable." *See Ruiz v. Estelle*, 650 F.2d 555, 565–66 (5th Cir. 1981); *Providence Journal Co. v. FBI*, 595 F.2d 889 (1st Cir. 1979).

---

18. Under the *Meredith* limited-waiver approach, of course, the privilege does not extend to the governmental unit to which disclosure was made. *Cf. United States v. Miller*, 660 F.2d 563 (5th Cir. 1981) (in a criminal tax fraud case the attorney-client privilege was waived with respect to ledger books previously turned over to the IRS during its civil investigation respecting the taxes in issue). The *Meredith* limited-waiver theory was rejected in *Permian Corp. v. United States*, 665 F.2d 1214 (D.C.Cir. 1981).